OPINION
The State of Ohio brings this appeal, pursuant to leave granted by this court, from the judgment of the Cuyahoga Court of Common Pleas granting the motion of defendant-appellee, Harold Corrothers, for a new trial. In its sole assignment of error, the state argues that the trial court abused its discretion by granting the motion on the basis of newly discovered evidence when that evidence failed to meet the requirements of State v.Petro (1947), 148 Ohio St. 505. We disagree and affirm the decision of the trial court.
The record reflects that on December 11, 1995, the Cuyahoga County Grand Jury indicted appellee on three counts of rape, in violation of R.C. 2907.02, relating to an alleged incident at the Wyndham Hotel in downtown Cleveland on November 10, 1995. Appellee pled not guilty to the charges.
The matter proceeded to trial on October 21, 1996. The jury was unable to reach a verdict, however, and, accordingly, the trial court dismissed the jury and set appellee's trial for a later date.
A second jury trial commenced on January 27, 1997. Prior to the commencement of the proceedings, the state dismissed two of the three counts against appellee; therefore, appellee's case proceeded on only one count. On January 29, 1997, the jury found appellee guilty of rape and the trial court subsequently sentenced appellee to a term of eight to twenty-five years of imprisonment.
On February 12, 1998, this court affirmed appellee's conviction. See State v. Corrothers (Feb. 12, 1998), Cuyahoga App. No. 72064, unreported.
On July 10, 1998, appellee filed a "Motion (Application) for Leave to File a Motion for a New Trial Based Upon Newly Discovered Evidence" and requested an oral hearing on his motion. On November 10, 1998, after an evidentiary hearing, the trial court granted appellee's motion for a new trial. The state appeals from this order, assigning one assignment of error f or our review:
 I. THE DECISION OF THE TRIAL COURT TO GRANT THE DEFENDANT'S MOTION FOR A NEW TRIAL CONSTITUTES AN ABUSE OF DISCRETION BECAUSE THE NEWLY DISCOVERED EVIDENCE PRESENTED BY DEFENDANT DOES NOT DISCLOSE A STRONG PROBABILITY THAT A DIFFERENT RESULT WOULD BE REACHED AT A NEW TRIAL.
Crim.R. 33 (B) governs the time-frame for filing motions for a new trial on the basis of newly discovered evidence. It provides, in pertinent part:
 Motions for new trial on account of newly discovered evidence shall be filed within one-hundred-twenty days after the day upon which the verdict was rendered * * *. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one-hundred-twenty day period.
In this case, the verdict was rendered on January 29, 1997. Appellee's counsel moved for leave to file the motion for new trial on July 10, 1998, well beyond the one-hundred-twenty day time limit imposed by Crim.R. 33 (B). Therefore, the preliminary question before us is whether appellee has shown by "clear and convincing" evidence that he was unavoidably prevented from discovering the new evidence before the time limit imposed by Crim.R. 33 (B) expired. Although the trial court did not issue an order granting appellee leave to file his motion, it implicitly found that this requirement was met because it conducted an evidentiary hearing regarding appellee's motion and, ultimately, granted appellee's motion for a new trial.
The grant or denial of a motion for leave to file a delayed motion for new trial lies within the sound discretion of the trial court. State v. Simms (June 24, 1999), Cuyahoga App. No. 74702, unreported, citing State v. Pinkerman (1993),88 Ohio App.3d 158. A motion for leave to file a delayed motion for a new trial pursuant to Crim.R. 33 (B) should be granted, however, where the defendant has shown by clear and convincing evidence that he was unavoidably prevented from discovering the new evidence within one-hundred-twenty days of the verdict. Id.
"[C]lear and convincing evidence" is defined as "that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." State v.Schiebel (1990), 55 Ohio St.3d 71, 74, citing Cross v. Ledford
(1954), 161 Ohio St. 469, paragraph three of the syllabus; In reAdoption of Holcomb (1985), 18 Ohio St.3d 361, 368.
Where the proof required must be clear and convincing evidence, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof. Schiebel, supra. It is well established that "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial court judge." Id., citing Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,80; Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279.
Here, the trial court did not err in finding that appellee has shown by clear and convincing evidence that he was unavoidably prevented from discovering the new evidence upon which his motion for a new trial was based within one-hundred-twenty days after the verdict against him was rendered.
At appellee's trial, the state presented the testimony of three witnesses; viz., Carrie Scott, housekeeping supervisor at the Wyndham Hotel; Detective Sergeant Gail Walsh-Koehl of the Cleveland Police Department's Sex Crimes Unit; and the alleged victim, April Jackson. Appellee presented the testimony of his supervisor, John Trzop, and also testified on his own behalf.
The testimony at trial indicated that on November 10, 1995, appellee was employed as a shift engineer at the Wyndham Hotel. He arrived at work at approximately 7:00 a.m., received his work assignment from his supervisor, ate breakfast, and then began making his "rounds," i.e., going from floor to floor, checking the electrical units in the hotel to ascertain that they were working properly.
April Jackson testified that she arrived for work at the hotel at 8:00 a.m. on November 10, 1995 to begin her duties as a housekeeper. She received an assignment from the housekeeping supervisor, Carrie Scott, to clean all but two of the rooms on the fourth floor of the hotel. After ascertaining that all of the rooms on the fourth floor were vacant, Jackson proceeded to the fourth floor. On her way there, she saw appellee. Because Ms. Jackson believed that appellee worked an afternoon shift, Jackson asked appellee why he was at work so early that day. Appellee informed Jackson that he worked an early shift on Fridays. After that brief encounter, Jackson proceeded on her way. After reaching the fourth floor, she assembled her supplies on her housekeeping cart, and then noticed that the housekeeper assigned to clean the other two rooms on the fourth floor was nearly finished with her work. Soon thereafter, Jackson was alone when she performed her duties.
Jackson testified that at approximately 9:15 a.m., while she was cleaning Room 401, appellee entered the room and asked her if she were going to be on the fourth floor all day. Jackson responded affirmatively and appellee left the room, stating that he was "going to lay down" in a vacant room.
Jackson testified that "around 10:30, 10:35 a.m." she was working inside Room 405 when appellee entered the room, approached her and began rubbing his hand on her legs and "raising up" her dress. Jackson testified that she told appellee that he should stop because he could "get in trouble" for such behavior, but appellee walked to the door, removed the vacuum cleaner that Jackson had placed there to hold the door open, placed it against the wall, and then locked the door.
According to Jackson, as she attempted to climb over the bed to reach the door, appellee grabbed her, pushed her down on the bed and proceeded to rape her. Eventually, appellee stood up, commented that Jackson was "no fun," and zipped his trousers. He then turned the television on, sat in a chair and proceeded to watch cartoons. Jackson testified that after a short time, appellee stated that he "couldn't believe it was almost 11 o'clock," and that he had to "go be seen." He then left the room.
After appellee departed, Jackson used the telephone in the room to contact her supervisor, Ms. Scott, and then attempted to clean herself up. Scott testified that she did not immediately respond to Jackson's call from Room 405, but when she arrived at the room, Jackson was in the bathroom, so distraught that it was difficult to understand her. Scott testified that at least twenty minutes passed before she was able to escort Jackson from the room to the office of the personnel director. The personnel director spoke with Jackson and then summoned the police.
At approximately 11:45 a.m., Detective Sergeant Gail Walsh-Koehl of the Cleveland Police Department's Sex Crimes Unit, received an assignment to go the Wyndham Hotel to investigate the incident. Walsh-Koehl spoke with Jackson and then sent her to a nearby hospital for examination. The results of the medical examination conclusively established only that Jackson had sexual relations with her boyfriend within twenty-four hours preceding the attack.
Walsh-Koehl then interviewed both appellee and his supervisor, Trzop, and although appellee denied any involvement in the incident, arrested appellee.
Appellee testified at trial that he was required to make his "rounds" on November 10, 1995, but denied that he was on the fourth floor at all on the day of the incident. Appellee also testified that he was with Trzop from approximately 10:30 to 11:30 a.m., fixing wires in the PBX office of the hotel. Trzop testified that appellee returned from his "rounds" at approximately 10:45 a.m. on November 10, 1995 and he and appellee then worked together until approximately 11:20 or 11:30 a.m.
In seeking leave to file his motion for a new trial, appellee submitted the affidavit of Angelique Shields. In her affidavit, Ms. Shields averred that she knew appellee as a co-worker at the Wyndham Hotel. Ms. Shields stated that on November 10, 1995, between 10:30 a.m. and 11:00 a.m., as she was using the telephone on the first floor of the hotel, she observed appellee walk past her on his way to the hotel restaurant. Accordingly, Ms. Shields averred, appellee could not have been in Room 405 between 10:30 a.m. and 11:00 a.m. raping April Jackson.
Ms. Shields stated further in her affidavit that although she learned sometime after November 10, 1995 that appellee had been charged with raping April Jackson, she thought that the charges against him had been dropped and he was living and working in Michigan. Ms. Shields stated that on November 26, 1996, she went on a ten-week maternity leave from her job at the Wyndham Hotel and, therefore, was not aware of appellee's trial. Shields averred that she did not learn until recently that appellee had been convicted of raping April Jackson.
On November 4, 1998, the trial court conducted an evidentiary hearing regarding appellee's motion. At the hearing, Ms. Shields testified that she happened to learn that appellee had been convicted of raping April Jackson when appellee's sister, who previously worked as a hostess in the hotel restaurant, called the catering office, where Shields works, wanting to talk to another employee. Shields answered the phone. When appellee's sister recognized Shields' voice, they began talking about what had happened to appellee.
Shields testified that she had not spoken with the police about what she had seen on the day of the incident because she was not aware that she had seen anything important. The trial judge questioned Shields:
THE COURT: Did you ever tell the police this?
 SHIELDS: No. They didn't question anyone. They just talked to our executive committee. I just remember them going into a big meeting that day.
THE COURT: But you never went to the police?
 SHIELDS: No. I never knew that there was a reason for me to come in.
Later in the hearing, the trial judge again questioned Shields about her failure to report what she had seen to the police:
 THE COURT: Let me get this straight. When is the first time that you heard that he was charged with rape; at that time in `95?
SHIELDS: Yes.
 THE COURT: Why, you knew you saw him, why wouldn't you call the police then and say, I have some information?
SHIELDS: I didn't know that I had any information.
 THE COURT: Because you didn't know the particulars of this, is that it?
SHIELDS: Yes, sir.
 THE COURT: Well, when did you learn that time was a factor?
SHIELDS: When I spoke with Vicki Ward.
THE COURT: Prior to that you never knew —
SHIELDS: Prior to that I had no knowledge, no idea.
 THE COURT: Well, did you ever learn any particulars of this incident?
SHIELDS: No, sir.
THE COURT: As to what anybody was saying about it?
SHIELDS: No, sir.
 THE COURT: You didn't know that she accused him of this incident?
 SHIELDS: I knew that she had accused him of the incident, but the only thing I knew is that Harold had been released and was working in Michigan. I never knew anything until the day the sister called.
THE COURT: So you felt he was working in Michigan?
SHIELDS: Yes, uh-huh.
THE COURT: Okay.
SHIELDS: Correct.
THE COURT: All right. Anything further?
 MS. WARD: And he was working in Michigan while he was out on bond.
THE COURT: Yeah, I understand that.
Based on this testimony, we cannot say that the trial court abused its discretion in finding that appellee proved by clear and convincing evidence that he was unavoidably prevented from discovering that Ms. Shields had relevant information until after the one-hundred-twenty day time limit imposed by Crim.R. 33 (B). Ms. Shields testified that she is not related to appellee and knows him only from working at the Wyndham Hotel. She testified further that she was never questioned by the police nor did she ever approach the police about what she had seen because she was not aware that what she had seen was important to the case. Indeed, Ms. Shields testified that until she learned otherwise in 1998, she was under the impression that the charges against appellee had been dropped and he was living and working in Michigan. Accordingly, the trial court did not err in granting appellee leave to file a delayed motion for a new trial.
Nor did the trial court err in granting appellee's motion for a new trial based upon newly discovered evidence. Crim.R. 33 (A) provides that:
 A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:
* * *
 (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial.
The Supreme Court has held that a ruling on a motion for a new trial is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. State v.Hill (1992), 64 Ohio St.3d 313; State v. Schiebel
(1990), 55 Ohio St.3d 71.
In State v. Petro (1947), 148 Ohio St. 505, the Supreme Court set forth the requirements for granting a new trial on the basis of newly discovered evidence:
 To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.
Appellant argues that the trial court abused it discretion in granting appellee's motion because appellee could have discovered the evidence before trial. Appellant contends that Ms. Shields testified that she has been employed at the Wyndham Hotel since June 12, 1995 to the present and that she was aware as of November 12, 1995 that appellee had been charged with rape. Accordingly, appellant contends that appellee could have discovered the information provided by Ms. Shields prior to trial.
We have already determined, however, that appellee proved by clear and convincing evidence that he was unavoidably prevented from discovering the information provided by Ms. Shields until well after the verdict against him was rendered. Appellant's argument, therefore, is without merit.
Appellant also argues that the evidence provided by Ms. Shields in her affidavit and at the evidentiary hearing is "highly suspect" because of the length of time that elapsed between the incident and her testimony. Further, appellant contends that Ms. Shields' testimony regarding when she saw appellee on November 10, 1995 is suspect because it conflicts with the testimony of the state's witnesses during appellee's trial regarding the timing of events on the day of the incident. The credibility of Ms. Shields and the evidentiary weight of her testimony, however, can be addressed by the state on retrial.
Finally, appellant argues that Ms. Shields' testimony simply reiterates appellee's testimony at trial that he was not on the fourth floor on the day in question and, thus, is merely cumulative to former evidence. We disagree.
Ms. Jackson testified that appellee entered Room 405 at "around 10:30, 10:35 a.m." on November 10, 1995 and proceeded to rape her. There were no witnesses other than Jackson, however, who testified that appellee was on the fourth floor of the Wyndham Hotel on the date of the incident, much less around 10:30 a.m. Furthermore, the state did not introduce a rape kit establishing that Jackson had been raped by appellee, nor was there any evidence of vaginal trauma or bruising, despite tests given to Jackson by medical personnel at a local hospital. No hair fibers or sperm belonging to appellee were found in Room 405, on Jackson or on her clothing. Accordingly, Angelique Shields' testimony that appellee could not have been in Room 405 at 10:30 a.m. on November 10, 1995 goes to the crux of the state's case. Contrary to appellant's argument, it is obviously material to the issues at hand and discloses a strong probability that it will change the result of trial.
The trial court's decision to grant a new trial based upon newly discovered evidence must be affirmed absent a gross abuse of discretion. Euclid Beach Ltd. v. Brockett (Dec. 9, 1999), Cuyahoga App. No. 75047, unreported. The deference shown to the trial court in such matters is premised in large part upon the familiarity of the trial court with the details of the case as a result of having presided over the actual trial. State v. Larkin
(1996), 111 Ohio App.3d 516, 523. Here, the trial judge who granted appellee's motion for a new trial was the same judge who heard the evidence in the two prior trials. It is apparent that he was very familiar with the case. Before granting appellee's motion, he stated:
 [T]his was a case I remember very well. I remember the victim testifying. We had no scientific evidence here, as I recall. So what it boiled down to was really the victim's statement, and the defendant, he said, she said thing, more or less is where we are at, but the Court has wrestled with this for a long period of time, with striving to see that justice is done in these cases as much as we can.
 There is no question that the Court feels that the witness apparently did not feel — or did not know at that time with Mr. Corrothers, being out of state, that her testimony would offer anything. So there was nothing driving her to go to the police, since apparently she thought he was out of the case by her own words.
 So, therefore, in the interest of justice, I'm going to grant a new trial.
Because the new evidence presented by appellee meets the requirements for granting a motion for new trial based on newly discovered evidence as set forth in State v. Petro, supra, we find no abuse of discretion in the trial court's decision to grant appellee's motion for a new trial.
Appellant's assignment of error is overruled.
It is ordered that appellee recover from appellant his costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. Case remanded to the trial court for further proceedings consistent with this opinion.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
DYKE, A.J. and PORTER, J., CONCUR.
 _________________________________ TIMOTHY E. McMONAGLE JUDGE