The STATE of Ohio, Appellant,

v.

LARKIN, Appellee.

[Cite as *State v. Larkin* (1996), 111 Ohio App.3d 516.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–950666.

Decided June 5, 1996.

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Christian J. Schaefer,* Assistant Prosecuting Attorney, for appellant.

*Timothy Smith* and *Kenneth L. Lawson,* for appellee.

*Per Curiam.*

The state of Ohio brings this appeal, pursuant to leave granted by this court, from the judgment of the trial court granting the motion of the defendant-appellee, Michael M. Larkin, for a new trial following his conviction for aggravated murder. In its sole assignment of error, the state argues that the trial court erred by granting the motion on the basis of newly discovered evidence when that evidence failed to meet the requirements of *State v. Petro* (1947), 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370. For the reasons that follow, we agree with the state and thus reverse.

I

Larkin was found guilty after a bench trial on May 31, 1995. Prior to sentencing, on June 13, 1995, Larkin filed a motion for a new trial under Crim.R. 33. A reading of the motion discloses three separate grounds: (1) newly discovered evidence, (2) insufficient evidence, and (3) denial of his right to a jury trial because his trial counsel had incorrectly counseled him that a bench trial would necessarily result in his acquittal. The affidavits of Rosalind Stewart, Robert Williams, and Vanessa Barham were filed to support the motion for a new trial.

Larkin was sentenced on June 22, 1995, to a term of twenty years to life, plus three years on a firearm specification. On July 13, 1995, however, the trial court granted Larkin's Crim.R. 33 motion for a new trial. Subsequently, on July 18, 1995, the state filed a motion to disqualify Larkin's trial counsel [1] and requested that the trial court reconsider its decision granting Larkin a new trial. On July 24, 1995, the trial court, although denying the state's motion to disqualify Larkin's trial counsel, vacated its previous order granting Larkin a new trial and reassigned the matter to a visiting judge for a hearing. [2]

On August 8, 1995, a hearing on the motion for a new trial began before the visiting judge. At the outset of the hearing, Larkin's counsel challenged the jurisdiction of the visiting judge and further argued that it was "imperative" that the original trial judge consider the motion because he was the person in the best position to gauge the impact of the newly discovered evidence upon that which was presented at trial. These objections were overruled.

Inexplicably, neither the state nor Larkin introduced a transcript of the trial at the hearing. Instead, Larkin's trial counsel summarized the trial evidence from the witness stand. On the day following the hearing, the visiting judge announced his decision from the bench to grant the motion for a new trial based upon his finding that Larkin had presented new material evidence which could not, with reasonable diligence, have been discovered and produced at trial. On August 18, 1995, an entry granting Larkin's Crim.R. 33 motion was journalized.

## II

■ Before we address the state's sole assignment of error, it is necessary first to consider the argument raised by Larkin that the original trial judge lacked the authority to reconsider and vacate his order granting the Crim.R. 33 motion for a new trial. Although Larkin was apparently not prejudiced by the decision to do so since the visiting judge to whom the motion was then assigned granted a new trial as well, Larkin's argument must be addressed because, if it is correct, the visiting judge's order, which is the only order appealed from, would be a nullity.

In support of his position that a trial court cannot reconsider its decision to grant a new criminal trial, Larkin cites a case from this court, *Montgomery v.*

---

1. The motion to disqualify Larkin's trial counsel resulted from allegations he had made in support of the Crim.R. 33 motion that the trial judge had signaled him that a bench trial would result in an acquittal. The state charged that, by virtue of these allegations, Larkin's trial counsel had become a witness to the Crim.R. 33 proceedings.

2. The trial court also journalized its own affidavit denying that it had told Larkin's trial counsel that a bench trial would result in an acquittal.

*Leach* (Apr. 10, 1985), Hamilton App. No. C–840467, unreported, 1985 WL 6732, in which we affirmed the trial court's decision to vacate an earlier order granting a new trial upon the basis of fraud. See, also, *Jelm v. Jelm* (1951), 155 Ohio St. 226, 44 O.O. 246, 98 N.E.2d 401. Because of language in *Leach* emphasizing the "longstanding deep-rooted rule of law that a court has power to vacate its judgments which have been fraudulently induced," Larkin argues that a trial court lacks the same power absent a finding of fraud. We disagree.

The Ohio Rules of Criminal Procedure do not specifically authorize a trial court to vacate an earlier order granting a new trial. However, Crim.R. 57(B) provides that "if no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules of criminal procedure, and shall look to the rules of civil procedure and to the applicable law if no rule of criminal procedure exists." Confronted with this same issue, the court in *State v. Groves* (Dec. 23, 1991), Warren App. No. CA91–02–014, unreported, 1991 WL 274317, relying in part upon our decision in *Leach,* concluded that "a trial judge, who has the discretion to determine whether or not a new trial should be granted, should be free to change the ruling if upon further and more mature deliberation, the judge concludes that justice so requires."

In the most lengthy discussion of this issue that we have found, the court in *United States v. Smith* (C.A.3, 1946), 156 F.2d 642, noted that Fed.R.Crim.P. 33, like its Ohio counterpart, does not cast any light upon the power of the trial court to reconsider its action in denying or granting a motion for a new trial. The court in *Smith,* however, concluded upon examination of the decided cases from state courts that "the weight of authority is in favor of such power, provided it is exercised within the term." *Id.* at 644. See, also, *Commonwealth v. Miller* (1838), 6 Dana 315, 36 Ky. 315; *Gonzales v. State* (1897), 38 Tex.Crim. 62, 41 S.W. 605; *Johnson v. State* (1908), 1 Okla.Crim. 321, 97 P. 1059, 18 Ann.Cas. 300; *State v. Luft* (1919), 104 Kan. 353, 179 P. 553; *People v. Cimino* (1914), 163 A.D. 217, 147 N.Y.S. 1079; *Hefton v. State* (1934), 206 Ind. 663, 190 N.E. 847; *Dimmel v. State* (1935), 128 Neb. 191, 258 N.W. 271; and *People v. Beath* (1936), 277 Mich. 473, 269 N.W. 238.

We hold, therefore, that the original trial judge did have the authority to reconsider and, upon more mature reflection, to vacate his original decision granting Larkin a new trial.

## III

■ In its sole assignment of error, the state argues that the newly discovered evidence upon which the visiting judge ultimately granted Larkin's motion for a new trial fails to meet the six-part test contained in the syllabus of *State v. Petro,*

*supra,* 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370. According to the syllabus of *Petro:*

"To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence."

Before addressing the merits of this argument, we must consider the truncated record upon which the Crim.R. 33 motion was ultimately decided. For reasons which are unclear, the parties apparently[3] agreed that a summary of the trial testimony by Larkin's trial counsel, not a transcript of the proceedings, would form the record upon which the visiting judge was to gauge the impact of the new evidence.

The state of the record in this case is more than just a curiosity because this court is necessarily bound by the record that was before the trial court in making its decision. See, generally, *State v. Ishmail* (1978), 54 Ohio St.2d 402, 8 O.O.3d 405, 377 N.E.2d 500, paragraph one of the syllabus. Our review of the new evidence must, therefore, be filtered through the same limited presentation of the trial evidence that was deemed appropriate by the parties and the trial court— the verbal summary of Larkin's trial counsel as subject to the state's cross-examination. While we are constrained to review the trial evidence from this limited perspective, nothing in this decision should be read to endorse what we perceive as an unnecessary and unwarranted circumcision of the record for the purposes of determining the materiality of new evidence presented in a motion for a new trial under Crim.R. 33.

*As summarized by Larkin's trial counsel,* Larkin was convicted largely upon the testimony of Shawanna Ogletree, an eyewitness to the slaying. Ogletree was the girlfriend of the victim, Paul Saturday. The two were together in her apartment at night when there occurred a knock on the door. Ogletree went to the door, peered out the peephole, and saw two men. Although she later claimed to have recognized the two men *at the time* as Larkin and Rodney Dyson, with ski masks pulled up to reveal their faces, Ogletree testified that she asked the

---

3. We say "apparently" because it is evident from the transcript of the hearing that the state was not entirely content to rest upon the summary of the evidence given by Larkin's trial counsel. Upon cross-examination, the prosecutor suggested that the summary had, in fact, "fallen short" with respect to the testimony of the state's two witnesses. We are at a loss to explain, however, why, if the state felt this was so, a transcript of the proceedings was not offered into evidence.

men to identify themselves, which they did with the names "Larry" and "Lamont." According to Ogletree's testimony, when Saturday then asked her who was at the door, she answered that it was "Larry" and "Lamont."

The two individuals then came through the door. Ogletree testified that she scratched the face of one of the assailants. The assailants then shot Saturday to death, one of them asking, "Where is my money?" or words to that effect. After the assailants left, Ogletree called 911. Asked by the 911 operator if she saw who committed the murder, Ogletree responded that she did not and that it was two "boys" with masks on. Moreover, because she had a "three-way" telephone, Ogletree was then able to "click over" to call her mother's house. In that conversation, which was recorded by the 911 operator, Ogletree spoke first to her sister, who asked her if she knew who killed Saturday. Ogletree responded that she did not get a chance to see the assailants.

When the police responded to the crime scene, Ogletree gave a description of the clothing worn by the two assailants, but did not identify Larkin or Dyson by name.

Larkin put on three witnesses in his defense. Larkin's girlfriend, Tina Grey, testified that late Friday night or Saturday morning before Saturday's murder, she and Larkin had gotten into an argument in which she inflicted a scratch on his face. Another witness testified that Saturday night, in the same area as the murder, she saw two people, whom she identified as "boys" because of their height, wearing ski masks. This same witness also testified that after the murder she went to the scene and someone told her that Saturday had been killed by "two boys with ski masks on." The third witness, Ronald Ralls, testified that at about the same time of the murder he was pushing the car Larkin was driving out of the snow twenty-five miles away.

The "new evidence" proffered by Larkin in support of his Crim.R. 33 motion consisted of affidavits and hearing testimony from four people: Rosalind Stewart, Marie Ogletree, Robert Williams, and Vanessa Barham.

In her affidavit, Barham stated that she was a very good friend of Shawanna Ogletree's and that she was with her at the hospital on the night of the murder. She stated that when the two of them were alone, Ogletree "indicated" to her that she "did not know nor could she tell who the individuals were" who came through the door that night because they were wearing ski masks. Barham also stated in her affidavit that, several months after the Saturday murder, Officer James Ohl arrested her for "an outstanding capias" and that he asked her to tell him the truth about who killed Saturday. Barham did not testify at the hearing on the motion.

Officer James Ohl was called by the state at the hearing specifically to address the Barham affidavit. Ohl testified that he had had a prior discussion with Barham, but that they never did discuss Shawanna Ogletree. He specifically denied ever asking Barham to tell him the truth as to who killed Saturday.

Marie Ogletree did not submit an affidavit. She testified, however, that she is the aunt of Shawanna Ogletree. According to Marie Ogletree, she called her niece's house the night of the murder and got the police. When they would not let her speak to Shawanna, Marie drove to Shawanna's apartment alone. She testified that when she got there she saw two men named "Shabacka" and "Johnny Eyeball" (so named because, according to Marie Ogletree, he has "one dead eye") parked outside in the latter's truck, both of them wearing blank expressions. She stated that when she asked Johnny Eyeball why they were there, he responded that Shawanna had called them at Man's Lounge and told them that "John had shot Paul." They claimed that they had then driven to the apartment to determine what was happening. She testified that she thought she saw a gun inside the truck, although she admitted that she was not certain.[4]

Marie Ogletree further testified that she and her fiance, Robert Williams, accompanied Shawanna to court on the day she gave her testimony. She testified that in the car on the way home she asked Shawanna why, if she identified the two men standing outside the door as Larkin and Dyson, she told Saturday that it was "Larry" and "Lamont." According to her aunt, Shawanna replied that she did not know with a blank look on her face. Marie Ogletree also testified that she called Shawanna the next day and asked her why she had called Johnny Eyeball and Shabacka at Man's Lounge on the night of the murder, and that Shawanna denied making such a telephone call.

Finally, Marie Ogletree testified that it was her feeling, based upon knowing Shawanna all her life, that Shawanna was lying with respect to what happened the night that Saturday was murdered. She conceded, however, on cross-examination, that she had no personal knowledge of the circumstances surrounding Saturday's murder.

Robert Williams submitted an affidavit in which he stated that he was the fiance of Marie Ogletree. He stated that after he and Marie Ogletree listened to Shawanna's testimony at trial, he "knew" it was not the truth. He stated further that in questioning after her testimony, Shawanna "remained silent" when asked why she identified Larkin as one of the assailants outside the door. He stated that she later told him for the first time that both assailants wore ski masks that

---

4. It should be noted that in a taped telephone interview with the prosecutor's office, introduced at the hearing as State's Exhibit No. 1, Marie Ogletree was quite emphatic that she could not state with any certainty that what she had seen was a gun.

had gold trim around the eyes and mouth. According to Williams, Saturday sold drugs to several individuals and had stopped weeks before his murder.

Testifying at the hearing, Williams conceded that he had no personal knowledge as to who killed Saturday. He testified that in a conversation between himself and Marie Ogletree after the murder, Shawanna indicated that Saturday had gotten into an argument about a parking spot with a person named "Bambi" and that this person was supposed to have been getting his cousin "to do something to [Saturday]." He testified that in a subsequent conversation, prior to trial, Shawanna indicated that the assailants were Larkin and Dyson. He further testified that after the trial he questioned her about why she told Saturday it was "Larry" and "Lamont" outside the door that night, and that she replied that she did not know.

Rosalind Stewart stated in an affidavit that in February 1995, she had a conversation with an individual known to her as Larry Barham. She stated that Barham was bragging to her at a party "about how cool he was and the things he had done in the past." She stated that he told her he had gotten away with "a lot of things, including killing someone."

 While normally the trial court's decision to grant a new trial based upon newly discovered evidence must be affirmed absent a gross abuse of discretion, see *State v. Howard* (June 25, 1986), Hamilton App. No. C–850755, unreported, 1986 WL 7135, the deference shown to the trial court in such matters is premised in large part upon the familiarity of the trial court with the details of the case as a result of having presided over the actual trial. Obviously, that is not the case here. Furthermore, the state's challenge to the granting of the motion constitutes a legal challenge to the competency of the evidence to satisfy the test set forth in *Petro*. As this court has previously held, a Crim.R. 33 motion based upon newly discovered evidence must "meet the six criteria of *State v. Petro*," *Howard, supra,* and whether it does specifically, or whether the evidence submitted is merely cumulative or serves only to impeach or contradict former evidence, is reviewable as a question of law.

Considering the evidence proffered in support of the motion, and comparing it to the summary of the trial evidence presented by Larkin's counsel, we agree with the state that it fails to meet the requirements of *Petro*. Specifically, we hold that the evidence does not satisfy the requirement that the new evidence be more than merely cumulative, and that it do more than simply impeach or contradict the former evidence. The inconsistency of Shawanna Ogletree accepting from the two assailants at the door the names "Larry and "Lamont," then relaying the names they had given to her to Saturday (toward whom, at least on this record, she had no apparent motive to lie), then telling the 911 operator and her sister that she did not know who the two men were, and then claiming later

to have recognized them from the beginning as Larkin and Dyson, was clearly patent from the evidence presented at trial as summarized at the hearing. The new evidence does not materially add to this inconsistency but consists merely of the opinions of others that what she testified to was a lie.

Some of the new evidence is, furthermore, simply too vague to be material. The affidavit of Rosalind Stewart fails to connect Larry Barham at all with the murder of Saturday. Moreover, any suggestion that Larry Barham is the "Larry" in the duo of "Larry" and "Lamont" is refuted by the hospital records introduced by the state showing that Barham was in a hospital in Atlanta, Georgia, at the time of the murder. The testimony of Marie Ogletree placing Shabacka and Johnny Eyeball outside Shawanna Ogletree's apartment on the night of the murder in response to an alleged telephone call by Shawanna, which she later allegedly denied, raises more questions than it answers. There is nothing concrete connecting these two strangely named characters with the murder. The hearsay testimony with respect to a possible feud between "Bambi" and Saturday over a parking spot offers nothing materially new since Larkin's counsel testified that this same information was produced at trial in the taped conversation with the 911 operator.

We hold, therefore, that the state's first assignment of error is well taken on the issue upon which it is presented, and we accordingly reverse the order of the trial court. We note, however, that the order granting the motion for a new trial did not rule upon the other two grounds upon which the motion was made. As this court cannot address findings which were not made below, we express no opinion on their validity and remand this cause to the trial court for further proceedings consistent with the law set forth herein.

*Judgment accordingly.*

DOAN, P.J., GORMAN and SUNDERMANN, JJ., concur.