The STATE of Ohio, Appellant,

v.

LUCKETT, Appellee█

[Cite as *State v. Luckett* (2001), 144 Ohio App.3d 648.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 77527.

Decided July 17, 2001.

*William D. Mason*, Cuyahoga County Prosecuting Attorney, *Richard J. Bombik* and *Saleh S. Awadallah*, Assistant Prosecuting Attorneys, for appellant.

*David Bodiker*, State Public Defender, and *Jill E. Stone*, Assistant Public Defender; *Terry H. Gilbert*, for appellee.

MICHAEL J. CORRIGAN, Presiding Judge.

The state of Ohio herein appeals from the judgment of the trial court, subsequent to an evidentiary hearing, to grant the appellee, Frederick F. Luckett, a new trial on two counts each of rape, kidnapping, and robbery, for which he was convicted in 1979. The appellee's motion for a new trial was premised on DNA analysis of a seminal fluid allegedly showing that appellee was excluded as the source of the sperm obtained via a vaginal swab from one of the victims soon after she was raped.

On September 6, 1979, appellee was indicted for two counts of rape, two counts of kidnapping, and two counts of aggravated robbery arising out of two separate incidents which each occurred on August 4, 1979.[1] In each of the incidents, the appellee was alleged to have abducted his victim off the street, forced her into his car, and then raped the victim. In addition to being raped, both women reported that the assailant demanded money and that he went through their purses. In one of the incidents, after raping the victim, the perpetrator forced her to remain in the car while he drove to her landlord's house, where he then instructed the victim to attempt to "borrow" $300 from her landlord and then to hand it over to him. After being allowed to exit the car the victim became hysterical, causing the assailant to flee the scene.

---

1. Around the same time period the appellee was indicted in the present case, he was indicted in three additional cases that are not part of this appeal but were originally consolidated with the present case for purposes of sentencing and direct appeal. In case No. 40524, the appellee was convicted, following a plea of no contest, of carrying a concealed weapon. In case No. 48533, the appellee was convicted, following a plea of no contest, of felonious assault arising out of an incident where he attacked another person with a razor blade. In case No. 50553, the appellee was convicted, following a plea of no contest, of kidnapping, rape, and felonious assault. All of the crimes arising from the four separate indictments were committed within a two-month period between June 10, 1979 and August 4, 1979, except the charge of carrying a concealed weapon.

A jury trial commenced on October 25, 1979. The appellee was convicted on both the two kidnapping counts and the two rape counts as they were contained in the indictment. In addition, the appellee was convicted on two counts of robbery, a lesser included offense of the counts of aggravated robbery for which he was indicted.

On appeal to this court the verdicts were affirmed.[2] See *State v. Luckett* (Oct. 2, 1980), Cuyahoga App. Nos. 41666, 41667, 41668 and 41669, unreported.

Although both victims sought medical treatment after being raped, the second victim, Clinkscales, waited a period of several days before doing so, making it impossible for hospital personnel to collect physical evidence of a sexual assault. The first victim, Martin, did go to Huron Road Hospital shortly after the commission of the offense, where a vaginal swab was administered and showed the presence of spermatozoa in the victim's vaginal canal. No tests were ever performed to confirm that the sperm in question belonged to the appellee, nor was any such test ever requested by the appellee's counsel.[3] Both victims (as

2. Although this court's decision affirmed the verdict of the trial court, the court did also find that the trial court "improperly sentenced the appellant for both the rape and kidnapping" of the second victim as there was not a separate animus involved in the commission of each of these offenses. This court did find that there was a separate animus involved in the rape and kidnapping of the first victim, as the perpetrator restrained the victim for a considerable period of time after raping her so that he could take her to her landlord's house in an attempt to get money.

3. DNA testing was not available in 1979. In *State v. Pierce* (1992), 64 Ohio St.3d 490, 597 N.E.2d 107, a case which also involved Cellmark Diagnostics, the Supreme Court held for the first time that DNA was admissible, relevant evidence in Ohio. The court first reviewed the trend towards accepting DNA evidence in other states both by the courts and state legislatures. The court then reasoned that DNA evidence satisfied the standard for admissibility of scientific evidence under existing Ohio law as articulated in *State v. Williams* (1983), 4 Ohio St.3d 53, 4 OBR 144, 446 N.E.2d 444:

"The standard for the admissibility of scientific evidence in Ohio as found in *State v. Williams* is whether the questioned evidence is relevant and will assist the trier of fact in understanding evidence presented or in determining a fact in issue. Pierce has not advanced any argument which would justify the use of a standard for the admissibility of DNA evidence different from that used in determining the admissibility of other scientific or technical evidence. DNA evidence may be relevant evidence which will assist the trier of fact in determining a fact in issue, and may be admissible, subject to a judicial analysis for prejudice. Any rebuttal evidence goes to weight rather than admissibility. We, therefore, hold that the trial court did not abuse its discretion in admitting the DNA evidence in this case.

"Although irrelevant for the determination of admissibility under Ohio law, the theory and procedures used in DNA typing are generally accepted within the scientific community. '[F]orensic uses of DNA tests are both reliable and valid when properly performed and analyzed by skilled personnel.' (Boldface type deleted.) Genetic Witness: Forensic Uses of DNA Tests, *supra*, at 7–8. The National Research Council's Committee on DNA Technology in Forensic Science also recently concluded that the procedures for measuring differences in DNA samples are 'fundamentally sound.' National Research Council, DNA Technology in Forensic Science (1992) S–24."

well as a third rape victim from case No. 50553) identified the appellee as the perpetrator of the offense by both appearance and voice from a lineup, and each testified that their assailant had a peculiar method of "dragging" his speech. Each victim also provided similar descriptions of the physical appearance and dress of their assailant and of the vehicle used in the commission of the crimes.

At trial the prosecutor made reference to the presence of sperm on the person of the first victim during his closing arguments as evidence that she had been raped, although there was no testimony provided by the victim as to whether her assailant had ejaculated during the commission of the offense. There was also never any testimony elicited at trial as to whether the first victim was sexually active and whether she had engaged in consensual intercourse with another male during the twenty-four-to-forty-eight-hour time period immediately preceding the time that she was raped.

Seventeen years later, on October 26, 1996, the appellee filed a motion with the trial court seeking a court order that Huron Road Hospital release the slide containing the specimen in question so that a DNA analysis could be conducted. This motion was not opposed by the state. The trial court ordered that the hospital release the slide for testing on November 15, 1996, and subsequently ordered that the Department of Rehabilitation and Correction permit blood to be drawn from the appellee.

The slide was initially sent to Forensic Science Associates ("FSA") in Richmond, California, for testing. FSA reported that the material on the slide was too deteriorated to produce any results. In a letter dated September 9, 1997, FSA reported its results as follows:

"1. The genes described above could not be amplified or typed from either the sperm DNA fraction or the E cell DNA fraction from the vaginal slide [Item 1]. Since no human DNA was detectable in either of these fractions it is likely that the DNA recovered from the spermatozoa and abundant white blood cells is inadequate for a PCR based DNA analysis of this evidence.

"2. It is likely that this evidence is inadequate, in part, due to the staining process [H & E] used on these cells. The hematoxylin stain typically employs both strong base and strong acid wash steps. This type of processing typically degrades DNA. While some samples processed in this manner may be successfully employed in a PCR analysis, this sample has not only been degraded by the histochemical staining process, it subsequently has been degraded by 20 years of aging. In light of this history, and our current findings, it is unlikely that DNA capable of a PCR based analysis remains in the cellular material from the slide."

FSA reported that its analysis consumed approximately half of the sample on the slide that had been preserved by Huron Road Hospital.

On January 27, 1998, FSA, at the appellee's request, sent the slide with the remaining sample to Cellmark Diagnostics in Germantown, Maryland, for further testing. Cellmark was able to conduct a DNA analysis on the remaining cellular material on the slide, but in doing so consumed the remainder of the sample. The Cellmark analysis concluded, in a report dated March 26, 1998, that "Frederick Luckett is excluded as a source of the DNA obtained from the sperm fraction of the slide."

Based upon these results, on April 21, 1998, the appellee simultaneously filed a motion for leave to file a motion for a new trial and a motion for a new trial. The trial court held evidentiary hearings on both of these motions.

The hearing on the motion for a new trial commenced on December 8, 1999. At the outset of the hearing, the parties entered into a nineteen-paragraph joint stipulation as to much of the evidence. Included in the stipulations were the following:

"1. The Ohio Supreme Court has held that DNA testing is scientifically valid, reliable and admissible as evidence.

"2. STR DNA testing (as performed by Cellmark Diagnostics in its analysis of the slide obtained from Huron Road Hospital) is scientifically valid, reliable and admissible as evidence.

"3. Cellmark Diagnostics is a reputable laboratory accredited for forensic work.

"4. On March 28, 1998, employees at Cellmark Diagnostics completed STR DNA testing and concluded that based on the sperm DNA in the Huron Road Hospital slide, M79–146, and blood DNA from appellee's sample, that the appellee is excluded as the source of the DNA obtained from the sperm fraction on the Huron Road Hospital slide."

On December 29, 1999, the trial court granted the appellee's motion for a new trial. The trial court found in part as follows:

"[Y]ou get into all these credibility questions and those are credibility questions that would go to a jury in this case. * * * [T]he jury is faced with the question of whether scientific testimony is so persuasive that it overrides these eyewitnesses. So that becomes a jury question.

"Certainly, identification in this case as a primary issue and, certainly, the State wanted to try the Clinkscales and the Martin cases together because, even if people are strangers to their assailant, thus have never seen the assailant before, could be greatly mistaken, maybe two of them together who come to this conclusion, or if one of them isn't such a strong witness but the other circumstances are so similar and the witness who is a strong witness is to be believed,

then even though the second eyewitness identification might be a little shaky, you can rely on the other witness. That is why this case was tried together. * * *

"So I think that the defense has shown here that this evidence is material and that it couldn't have produced the evidence at the time of this trial and that it has brought it forward in a timely fashion, after the science itself had become developed and accepted. So, I am going to grant this motion, as it relates to the cases involving Ms. Clinkscales and Ms. Martin."

It is from the trial court's order granting the motion for a new trial that the state brings the instant appeal. The state presents the following single assignment of error for this court's review:

"The trial court abused its discretion and acted in a capricious and arbitrary manner by granting the defendant's motion for new trial based upon newly discovered evidence contrary to Criminal Rule 33(A)(6), *State v. Petro* and the trial court's own orders to the parties."

Crim. R. 33(A)(6) provides as follows:

"(A) Grounds. A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

"* * *

"(6) When new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to produce such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses."

The Supreme Court held in *State v. Petro* (1947), 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370, that, in order to obtain a new trial based upon newly discovered evidence, a defendant must show that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) was discovered after the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to the former evidence, and (6) does not merely impeach or contradict the former evidence. See, also, *State v. Chancey* (Feb. 17, 2000), Cuyahoga App. Nos. 75633 and 76277, unreported, 2000 WL 193235; *State v. Corrothers* (Feb. 3, 2000), Cuyahoga App. No. 75668, unreported, 2000 WL

126750; *State v. Porter* (Dec. 30, 1999), Cuyahoga App. No. 75452, unreported, 1999 WL 1271722.

A trial court's decision to grant or deny a motion for a new trial is not subject to reversal on appeal absent an abuse of discretion. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 564 N.E.2d 54, syllabus. An abuse of discretion exists where the trial court record demonstrates that the court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Montgomery* (1991), 61 Ohio St.3d 410, 413, 575 N.E.2d 167, 170–171; *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172–173, 404 N.E.2d 144, 148–149. The discretionary decision to grant a motion for a new trial is an extraordinary measure which should be used only when the evidence presented weighs heavily in favor of the moving party. *State v. Otten* (1986), 33 Ohio App.3d 339, 340, 515 N.E.2d 1009, 1010–1011; *State v. Wilson* (Dec. 3, 1998), Cuyahoga App. No. 72165, unreported, 1998 WL 842060.

"A more searching inquiry is required" if the new trial is granted than if denied, however, because of "the concern that a judge's nullification of the jury's verdict may encroach on the jury's important fact-finding function." *Tri Cty. Industries, Inc. v. Dist. of Columbia* (C.A.D.C. 2000), 200 F.3d 836, 840, citing *Langevine v. Dist. of Columbia* (C.A.D.C. 1997), 106 F.3d 1018, 1023.

The deference shown to the trial court in such matters is premised in large part upon the familiarity of the trial court with the details of the case as a result of having presided over the actual trial. *State v. Larkin* (1996), 111 Ohio App.3d 516, 523, 676 N.E.2d 906, 911. In giving deference to the conclusions of the trial court, we note that the trial judge who ruled on the motion for a new trial was the same judge who presided over the appellee's original trial in 1979 and was thus uniquely qualified to evaluate the new evidence proffered by the appellee and to determine its potential effect on the result of a new trial.[4] See *State v. Corrothers, supra.*

Applying the six-part standard of *State v. Petro* to the facts of the instant case, we conclude that the trial court abused its discretion in granting the appellee's motion for a new trial, as it failed to make a finding that there was a "strong probability" that a new trial would result in a different outcome. Indeed,

---

4. During the appellee's sentencing on all four cases on November 7, 1979, the trial judge stated that he was absolutely convinced of the appellee's guilt in each case:

 "* * * I think that the evidence is clear from the trial that I heard that you did do it.

 "* * * [T]he court does not see any point in heaping futile sentences and the law, in fact, makes any sentence that has a minimum of more than ten years in a case like this a futile sentence because the Parole Board has the authority to grant parole after ten years has been served.

 "* * * I don't have any question that the defendant is the man who committed these crimes. The jury verdict was right. And it's just as horrible for everyone."

the colloquy between the trial court and counsel immediately prior to the ruling seems to suggest that the trial judge did not believe that there was a strong probability that a new trial would have a different result. Although the trial judge did ultimately grant the appellee's request for a new trial, he did not find that there was a probability, much less a strong probability, that the result of a second trial would have been different.

**▮** The trial judge specifically stated during the hearing on the motion for leave to file a motion for a new trial that the new evidence was not probative absent a showing that the sperm sample tested came from the rapist, "[o]nly if you can show that the sperm came from the rapist, and that it shows that it wasn't him, that's the only way this has value." No such evidence as to the source of the sperm sample was ever offered. It is not enough for a trial court to conclude, as did the trial court herein, that newly discovered evidence discloses a *possibility* that it will change the result if a new trial is granted. If that were the standard for granting a motion for a new trial based upon newly discovered evidence, we would probably affirm the decision of the trial court. Nor is it enough, as the dissenting opinion suggests, to conclude that *if* the jury believes that the new evidence is more persuasive than testimony given by eyewitnesses, then a strong probability would exist that the result of the trial would be different. We can find no precedent for concluding that *State v. Petro* permits a motion for a new trial to be granted on a hypothetical finding that a possibility exists that the result of the new trial might be different.

The record reflects that the first victim in this case, Martin, who was unwavering in her identification of the appellee both during the investigation and trial, is no longer living and would not be available to testify at the new trial. Her testimony from the 1979 trial would have been admissible at a new trial under Evid.R. 804(A)(4) and Evid.R. 804(B)(1). The second victim, who also repeatedly identified the appellee, is still alive and would presumably have been available to testify.

The appellee would have faced numerous obstacles in attempting to obtain a judgment of acquittal in a new trial, as was recognized by the trial court in making its ruling.

**▮** In addition to numerous chain-of-custody issues, which would go to the weight of the evidence, the appellee would have had the burden of establishing the relevance of the DNA evidence given the facts that there was *no* female cellular material found on the slide and *no* scientific evidence that the sperm on the slide tested by Cellmark came from the person who raped Martin.

There is simply no evidence in the record either that the individual who raped Martin ejaculated during the commission of the offense and/or that Martin was

not otherwise sexually active at the time of the rape. Although appellee was asked to address these issues both by the trial court in its order granting an evidentiary hearing on the motion for a new trial, and by this court during oral argument, nothing more than speculation has been offered. We cannot presume that a rape victim is not sexually active at the time of the offense merely because she was fifty-one or fifty-two years old at the time she was victimized. Without answers to these questions the DNA evidence offered by the appellee is of little probative value and is insufficient to establish a strong probability of a different result in the eventuality of a new trial.

Although DNA testing was not available at the time of the trial, the appellee could have had the recovered secretion blood-typed to potentially rule him out as a suspect if he knew that he was not the perpetrator, but, for what were presumably strategic reasons, he chose not to do so. At trial, the appellee completely ignored the issue of the identity of the male whose sperm was detected by hospital personnel after the rape.

In his testimony at the hearing, Dr. Blake of FSA stated in regards to the slide containing the cellular material in question:

"[T]he analysis is *meaningless* without being able to answer the question whether or not the sperm DNA originated from Mr. Luckett *and the nonsperm DNA originated from Ms. Martin.*

"* * * [I]n the normal course of events, in the analysis of sexual assault evidence, you will obtain and [*sic*] nonsperm fraction that is enriched in DNA from the female * * * and you will obtain a DNA preparation that is enriched in sperm DNA. * * *

"* * * And the female provides a built-in internal control for the, not only the veracity of the analysis but for the integrity of the particular specimen subjected to the analysis.

"So in this particular situation the expectation would be, putting aside the question of the source of the spermatozoa, one would expect a successful analysis to reflect that the nonsperm DNA had the same genetic profile as Ms. Martin absent commingling of the sperm DNA and the nonsperm fraction." (Emphasis added.)

In this case it was never established that the slide in question contained nonsperm DNA which originated from the first victim, Martin. This was despite the fact that Dr. Blake testified that he observed distinctively female "epithelial cells" upon his initial microscopic examination of the same slide at FSA. Dr. Charlotte Word from Cellmark testified that the Cellmark staff DNA analyst who checked the slide for female epithelial cells did not detect any such cells and stated that it was not possible to determine whether any DNA from a female was

present on the slide. This failure to identify the presence of female nonsperm DNA on the sample tested, the built-in internal control of the veracity, and the integrity of the sample necessarily compromised the new evidence presented by the appellee.

Dr. Blake also testified to the importance of preserving portions of any sample tested for potential peer review including future testing by litigants with adverse interests:

"The consideration of providing or making sure, to whatever extent it is reasonably possible, the opportunity for a colleague to peer review one's work is always a part of what I would characterize as good science.

"It is much more important to, however, in criminal litigation in particular, where there are adversarial interests.

"I mean, I don't know how I can express that decision-making process any more clearly than I have except to tell you that, you know, it is the kind of thing that, at least in my laboratory, it might not be true in other laboratories, but I have an overbite, or abiding concern to make sure that this kind of issue can be properly dealt with so that the work product itself is not undermined by a failure to provide the opportunity for peer review."

In this case, Cellmark, through no fault of its own, consumed the remainder of the sample on the slide in the course of its testing. Thus, there is no opportunity to have the material retested or to bring in another expert for the purposes of peer review, further undermining the usefulness of the appellee's new evidence.

A review of the transcript from the original trial in this case clearly demonstrates that the state's case was premised on eyewitness identification. Both victims were able to repeatedly identify the appellee not only by appearance but also by his distinctive voice and speech patterns. A third rape victim, in case No. 50553, also identified the appellee as her assailant.[5] This court is aware that the prosecutor in the original trial made some references during closing arguments to the fact that sperm was found on the material obtained from the vaginal swab performed on the first victim and that a medical report that indicated that a vaginal culture tested positive for sperm was admitted into evidence at the appellee's trial. Nonetheless, there is no indication from the record that the mention of the presence of spermatozoa during closing argument was sufficiently central to the state's case that without it the result of the trial would have been different. One such reference was merely as follows:

---

5. Per Evid.R. 404(B), the testimony of the third victim would be arguably admissible at any new trial as evidence of other crimes, wrongs, or acts for purposes other than to show that the appellee acted in conformity therewith, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

"Sperm was found. There is the rape, just as Mr. Lippe (defense counsel) said. 'We are not going to dispute the crimes. We are going to say it wasn't him.' But let's look at the ID's."

The other two references to the presence of sperm by the prosecutor during closing argument were similar in that the prosecutor simply reiterated that sperm was found during the examination of Martin.

Thus, the prosecutor and the appellee's attorney agreed that the presence of sperm was not material to the identity of the assailant. Identity was established exclusively through eyewitness identification by both of the victims, including voice identification.

It is well settled that statements made by counsel in opening statements and closing arguments are not evidence. *State v. Frazier* (1995), 73 Ohio St.3d 323, 652 N.E.2d 1000. Prior to closing arguments, the trial court instructed the jury as follows:

"I want to remind you once again that what the lawyers say does not constitute evidence. The evidence again is what you have heard from the witness stand and the exhibits which have been admitted and will go with you to the jury room."

The second victim, Clinkscales, identified the appellee out of a lineup and at trial. Because she waited several days to report that she had been raped, there was never any physical evidence introduced at trial to confirm that she had been raped, as no such evidence existed. It is sheer speculation to assume that the presence of sperm of an unknown origin detected by a vaginal swab performed on one victim (who may or may not have been sexually active at the time she was raped) creates a strong probability that the appellee would be acquitted subsequent to a retrial on the rape, kidnapping, and robbery charges relating to the second victim. The new evidence is of scant probative value, as it relates to the second victim and plainly is inadequate to create a strong probability that the verdict as to those counts will be different if the appellee is granted a new trial.

Although, the prosecutor did refer to the presence of sperm during his closing arguments, the jury was never told that the sperm originated from the appellee and was never told that the perpetrator ejaculated during the rape of Martin. The appellee could have pursued either of these issues at trial but chose not to do so. We cannot now assume that the jury inferred that the appellee was conclusively established as the source of the sperm found on the person of Martin and based their verdict on this inference.

During the hearing held by the trial court on the appellee's motion for leave to file a motion for a new trial, the trial judge stated that any DNA results excluding the appellee as the source of the specimen contained on the slide in

question would not be probative without additional evidence that the sperm came from the rapist:

"It doesn't show—well, it's got to show two things. One is that whoever committed the rape is the person whose sperm was in her body. That's got to be an element, because if all your evidence shows is that it's somebody else's sperm, because she could have had intercourse with somebody seven days before, then it has no significance, then it's just a side issue, has no significance. Only if you can show that the sperm came from the rapist, and that it shows that it wasn't him, that's the only way this has value.

"* * *

"I don't think the sperm ever showed he did it.

"* * *

"All the sperm showed was that she had intercourse with somebody in a short period of time. Now I'm saying to you if your evidence doesn't show both, that this would have come from the person who raped her, and that the evidence you've already shown, shows it didn't come from him, but if it doesn't show that it came from the person who raped her, it's not probative evidence."

In its order granting the appellee's request for an evidentiary hearing on the motion for a new trial, the trial court stated:

"The parties shall be prepared to present to the Court:

"* * *

"4) Evidence as to other possible sexual partners of the victim during the relevant time period.

"* * *

"6) Expert testimony as to any relevant conclusions based on the testing."

The appellee did not present testimony as to other possible sexual partners of the victim during the relevant time period and did not present expert testimony as to relevant conclusions to be drawn from results of the testing. Dr. Charlotte Word of Cellmark testified that the DNA identified from the sperm sample that she tested could not have come from the appellee, but neither she nor anyone else, other than Dr. Blake, testified to any relevant conclusions based on the testing.

At the hearing on the motion for a new trial, the trial court once again expressed skepticism as to the probative value of the new evidence, but nonetheless granted the motion based on a finding that the new evidence was material and could not in the exercise of due diligence have been discovered prior to trial. It was not enough that the trial court make a finding as to the materiality of the

evidence. It was also necessary to make a finding under *State v. Petro* that it was strongly probable that the new evidence would have changed the result of the trial. The trial judge did not make a finding that the new evidence disclosed a strong probability that it would change the result if a new trial was granted, but, rather, ignored this requirement. In failing to apply the first prong of the six-part standard of *State v. Petro* dealing with Crim.R. 33(A)(6) motions for a new trial, the trial court abused its discretion.

Accordingly, because we conclude that the trial court abused its discretion in granting the appellee's motion for a new trial, and because we conclude that the appellee failed to carry his burden of establishing that the new evidence created a strong probability of a different result if a new trial were granted, this assignment of error is sustained.

*Judgment reversed.*

GEORGE, J., concurs separately.

COONEY, J., dissents.

JOYCE J. GEORGE, J., retired, of the Ninth Appellate District, sitting by assignment.

JOYCE J. GEORGE, Judge, concurring.

I concur with the majority opinion that the trial court abused its discretion, first, by not following the standards it established for itself and, second, by not making the findings required by *State v. Petro* (1947), 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370. Before reaching the requirements of *Petro*, the trial court set out an evidentiary standard to be met, *i.e.*, that the DNA evidence would only be probative if the defendant could show that the sample came from the rapist. No evidence was offered as to the source of the DNA. Nonetheless, the trial court granted a new trial, ignoring the very standard it had established to be met. This was an abuse of discretion, preceding the failure to make the *Petro* findings.

COLLEEN CONWAY COONEY, Judge, dissenting.

On this appeal from the trial court's decision to grant appellee's motion for a new trial, I respectfully dissent from the decision of the majority.

The Ohio Supreme Court has held that "[t]he allowance of a motion for a new trial on the grounds of newly discovered evidence is within the competence and discretion of the trial judge; and in the absence of a clear showing of abuse such decision will not be disturbed." *State v. Hill* (1992), 64 Ohio St.3d 313, 333, 595 N.E.2d 884, 900, citing *State v. Williams* (1975), 43 Ohio St.2d 88, 330 N.E.2d 891,

paragraph two of the syllabus; see, also, *State v. Lopa* (1917), 96 Ohio St. 410, 411, 117 N.E. 319; *State v. Larkin* (1996), 111 Ohio App.3d 516, 676 N.E.2d 906; *Euclid Beach Ltd. v. Brockett* (Dec. 9, 1999), Cuyahoga App. No. 75047, unreported, 1999 WL 1129086 (applying a standard of *gross* abuse of discretion).

It is well established that "[t]he term "abuse of discretion" connotes *more than an error of law or of judgment;* it implies that the court's attitude is unreasonable, arbitrary or unconscionable." (Emphasis added.) *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172–173, 404 N.E.2d 144, 149 citing *Steiner v. Custer* (1940), 137 Ohio St. 448, 19 O.O. 148, 31 N.E.2d 855; *Conner v. Conner* (1959), 170 Ohio St. 85, 9 O.O.2d 480, 162 N.E.2d 852; *Chester Twp. v. Geauga Cty. Budget Comm.* (1976), 48 Ohio St.2d 372, 2 O.O.3d 484, 358 N.E.2d 610; see, also, *State v. Montgomery* (1991), 61 Ohio St.3d 410, 413, 575 N.E.2d 167, 170–171; *State v. Lowe* (1994), 69 Ohio St.3d 527, 532, 634 N.E.2d 616, 620. This court has stated that "[a]buse of discretion is found in the rare instance when a decision is grossly violative of fact and logic so as to demonstrate perversity of will, defiance of judgment, undue passion or extreme bias." *State v. Wynn* (1998), 131 Ohio App.3d 725, 723 N.E.2d 627, citing, *State v. Jenkins* (1984), 15 Ohio St.3d 164, 222, 15 OBR 311, 360–361, 473 N.E.2d 264, 313–314; *State v. Lombardo* (Feb. 15, 1995), Summit App. No. 16368, unreported., 1995 WL 66354

Whether the trial court has abused its discretion in granting a new trial *must be disclosed from the entire record.* *State v. Petro* (1947), 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370, citing *Lopa,* 96 Ohio St. 410, 117 N.E. 319. An appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial court judge. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54, 60–61.

While it is true that the trial court only specifically addressed some of the six criteria set forth in *Petro,* such failure may amount to an error, but, in my view, it does not rise to the level of abuse of discretion. The question is whether a review of the entire record supports the trial court's decision to grant the new trial. Thus, because the record reveals that the new evidence meets the *Petro* requirements, the trial court did not abuse its discretion.

As the majority states, the state based its case on the issue of identification. The trial court stated in its decision granting a new trial that the new DNA evidence raises an issue of credibility regarding the identifications given by the eyewitnesses. The trial court further stated that at the new trial, "the jury is faced with the question of whether scientific DNA testimony is so persuasive that it overrides these eyewitnesses." The trial court's statement suggests that if the jury believes that the DNA testing is more reliable than the testimony given by

the eyewitnesses, a strong probability exists that the result of this trial would be different. Thus, the first prong of *Petro* has been met.

Further, the record shows that the trial judge gave the motion for a new trial careful and honest consideration. The trial court held two hearings on this matter, one on appellee's motion for leave to file a motion for new trial and another on appellee's motion for a new trial. The evidentiary hearing on the motion for a new trial lasted nearly six hours. During that time, evidence was submitted by expert testimony, and the trial judge questioned these witnesses in areas where clarification was necessary. Therefore, it cannot be said that the trial court acted unreasonably, arbitrarily, or unconscionably in making its decision.

In addition, the trial judge had conducted the original trial, so he was "exceptionally qualified" in making the determination to grant the motion for new trial. *See Williams*, 43 Ohio St.2d at 93, 72 O.O.2d at 51–52, 330 N.E.2d at 894–895, citing *United States v. Johnson* (1946), 327 U.S. 106, 112, 66 S.Ct. 464, 466–467, 90 L.Ed. 562, 566. Deference is shown to the trial court in such matters because of the familiarity of the trial court with the details of the case as a result of having presided over the actual trial. *See Larkin*, 111 Ohio App.3d at 523, 676 N.E.2d at 911. Here, the trial judge who granted appellee's motion for a new trial was the same judge who heard the evidence in the initial trial.

Notwithstanding the fact that the record as a whole supports the trial court's decision to grant a new trial, the majority argues that the trial court should have required appellee to present evidence as to the source of the sperm that was found on the first victim and on her clothing hours after the attack, and should have determined whether the victim had consensual intercourse within forty-eight hours of the rape. It is uncontradicted that at the hearing on the motion for leave to file the motion for new trial, the trial court stated that the *parties* would be required to produce the evidence described above.

Essentially, the majority is placing the burden solely on the appellee to produce evidence outside his counsel's capability. It is important to note that the first victim is no longer alive; therefore, there is no way for the appellee to obtain information about any consensual sexual partners she may have had at the time of the attack.

Furthermore, it was not the appellee's burden at trial, nor is it now his burden, to prove his innocence. Instead, as with all criminal trials, it was the prosecutor's burden to prove appellee's guilt beyond a reasonable doubt.

Two theories of the source of the sperm have been set forth. First, as argued by the state at trial, the sperm belonged to the rapist. The majority argues that although DNA testing was unavailable, that the appellee should have used the

secretion blood-type test to "potentially rule himself out as a suspect." The majority also implies that the appellee did not do so for strategic reasons. However, it was not the burden of the appellee to prove his innocence at trial; it was the state's burden to prove his guilt. Thus, if this test existed, the state could have used the secretion blood-type test which would have helped in determining the source of the sperm. However, the state also made a strategic choice not to test the sperm that was found on the rape victim within two hours of her attack.

The second theory presented by the majority is that the sperm in question did not belong to the rapist at all but that its source was a possible consensual partner of the first victim. As noted by the majority, the purpose of a rape kit is to gather physical evidence. R.C. 2907.29. The sperm sample in question came from the prosecutor's evidence. Thus, as part of its investigation it was the role of the medical personnel or law enforcement officers to question the victim as to her other sexual partners as a means of identifying the source of the sperm. If the state had asked such routine questions of the victim, the prosecution would have been able to make a strong argument as to the source of the sperm. By contrast, it was not the appellee's role at trial to interrogate the victim as to her sexual habits. See R.C. 2907.02(D); Evid. R. 404(A)(2).

Thus, because the new evidence presented meets the requirements for granting a motion for a new trial as set forth in *Petro*, I would find no abuse of discretion in the trial court's decision to grant appellee's motion for a new trial.