OPINION
{¶ 1} Defendant-appellant, John C. Stojetz, appeals a decision of the Madison County Court of Common Pleas denying his motion for a new trial.
 {¶ 2} Appellant was indicted in 1996 on one count of aggravated murder in violation of R.C. 2903.01(A) with a death penalty specification of committing aggravated murder while a prisoner in a detention facility. The charge stemmed from an incident which occurred on April 25, 1996 wherein appellant, then an inmate at the Madison Correctional Institution ("MCI"), and five fellow inmates entered Adams Alpha ("Adams A") Unit, the cell block at MCI which housed juveniles tried and convicted as adults, and chased Damico Watkins, a 17-year-old black juvenile inmate, throughout Adams A, stabbing him to death. A jury trial held in April 1997 revealed the following pertinent facts:
 {¶ 3} On April 25, 1996, appellant, Jerry Bishop, James Bowling, David Lovejoy, William Vandersommen, and Phillip Wierzgac, ran across the prison yard and toward the Adams A unit. Appellant and the other five inmates were each armed with homemade knives commonly known as "shanks." Appellant's shank was the biggest. Adams A was in lock-down for a head count before lunch. Appellant and the other inmates entered Adams A, circled the control desk, and held Correction Officer Michael Browning, the guard on duty at Adams A that day, at knifepoint. Appellant then held his shank to Browning's throat and ordered him to give the keys that opened the cell doors of the Adams A unit. Browning complied and was allowed to flee the unit. Other corrections officers who subsequently tried to enter Adams A were prevented from doing so by the shank-wielding inmates.
 {¶ 4} Once inside Adams A, appellant and the other inmates proceeded to Watkins' cell. They did so without talking and without hesitation. Using the keys taken from Browning, appellant unlocked Watkins' cell and he and his accomplices entered the cell and began attacking Watkins. After escaping from his cell, Watkins was pursued throughout Adams A and repeatedly stabbed by appellant and his accomplices. Watkins was able to escape his attackers several times only to be again cornered and repeatedly stabbed. Eventually, Watkins was cornered by appellant on the second floor of the Adams A unit. As Watkins pled for his life, saying he was not the one who did it, appellant and Bishop repeatedly stabbed Watkins and left him for dead. Appellant and his accomplices then tried to get in another juvenile's cell but could not (at that point in time, they no longer had the key they used to open Watkins' cell as it had broken off in Watkins' cell lock). Evidence at trial revealed that appellant and his accomplices also tried to stab Watkins' cellmate.
 {¶ 5} During the attack on Watkins, Deputy Warden Mark Saunders arrived on the scene and began conversing with appellant and his accomplices. During that conversation, appellant stated that "we took care of things because you [prison officials] wouldn't." Appellant and his accomplices eventually surrendered to prison authorities. On their way out of Adams A, appellant and the other five inmates cussed the juvenile inmates, stating "we killed the nigger. We did what we had to do."
 {¶ 6} Appellant's sweatshirt, and in particular his right sleeve, had a lot of blood on it. During his surrender, appellant stated "that it wasn't over, he wasn't through, he wasn't finished, * * * they had beat up one of the brothers the night before and they was going to pay for it[.]" To a juvenile inmate who was hollering at him, appellant stated "I'm not through yet you pussy-lipped, son of a bitch, nigger. I will get you." While on the ground in the prison yard and outside Adams A, appellant also yelled to juvenile inmates that "this won't be the last. * * * You wasn't talking that shit when I was in the cell and you got down on your knees," and that "he had more to kill * * *, that he was going to kill three more and * * * if he didn't get to take care of it his Aryan brothers would take care of it, this would teach them not to fuck with the AB [Aryan Brotherhood]." To a correction officer, appellant stated "I told you it was going to happen."
 {¶ 7} After prison authorities regained control of the Adams A unit, the coroner arrived at the scene and declared Watkins dead. Watkins had been stabbed 40 times. The coroner testified that six of Watkins' stab wounds were lethal. Two of the six lethal wounds were attributed to appellant's shank.
 {¶ 8} Evidence at trial revealed that appellant was known to be the head of the "Aryan Brotherhood" gang at MCI, and that appellant and other members of the Aryan Brotherhood did not want to be celled with black inmates. After the inmates surrendered, the statement "don't fuck with the AB" was discovered on one of the Adams A unit walls. Evidence at trial further revealed that appellant and other Aryan members wanted to be transferred from MCI to the higher security Southern Ohio Correctional Facility at Lucasville, Ohio, a more segregated environment, and that they were going to do what they had to do to get their wish. Following Watkins' murder, a search of appellant's cell as well as the cells of his accomplices revealed that appellant and four of the other five inmates who had participated in the attack on Watkins had already packed their personal belongings.
 {¶ 9} Douglas Haggerty testified on behalf of appellant. Haggerty was a juvenile inmate at MCI and an Aryan member under the protection of appellant. Haggerty testified that the black inmates were running the whole juvenile unit, taking white inmates' property, and that the correction officers were scared of them. Haggerty explained that if you tried to stop the black inmates, you would get beat up. The day before Watkins was murdered, Haggerty got into a confrontation with another inmate over a magazine. Haggerty testified that during the confrontation, he was hit from behind by Watkins. During the fight, Watkins told him that they were going to kill appellant and that "they were going to get all the Aryan nation[.]"
 {¶ 10} On April 8, 1997, a jury found appellant guilty as charged. Appellant was subsequently sentenced to death. His conviction and sentence were upheld by the Supreme Court of Ohio. State v. Stojetz,84 Ohio St.3d 452, 1999-Ohio-464. Following appellant's trial, Bishop and Bowling were both tried and convicted of murder and sentenced to 15 years to life imprisonment. Both convictions and sentences were upheld on appeal. State v. Bowling (Nov. 22, 1999), Madison App. No. CA98-09-034;State v. Bishop (Oct. 5, 1998), Madison App. No. CA97-07-032. Lovejoy, Vandersommen, and Wierzgac entered guilty pleas. Wierzgac was deposed in December 1997 and testified at Bowling's 1998 trial. Based upon Wierzgac's deposition and testimony, appellant filed a motion for a new trial pursuant to Crim.R. 33(A)(6). The motion was overruled by the trial court. This appeal follows in which appellant raises two assignments of error.
Assignment of Error No. 1
 "THE TRIAL COURT ERRED IN DENYING APPELLANT STOJETZ'S MOTION FOR A NEW TRIAL."
 {¶ 11} Before a new trial can be granted on the basis of newly-discovered evidence, the defendant must show that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. State v. Petro (1947), 148 Ohio St. 505, syllabus. We note that the trial court properly found that Wierzgac's deposition and testimony met the second and third criteria under Petro as such statements were made more than 120 days after appellant's trial.
 {¶ 12} A ruling on a motion for a new trial on the ground of newly-discovered evidence is within the discretion of the trial court and, in the absence of a clear showing of abuse of discretion, will not be disturbed on appeal. State v. Williams (1975), 43 Ohio St.2d 88, paragraph two of the syllabus. "Where the case has been tried to a jury, the task for the trial judge is to determine whether it is likely that the jury would have reached a different verdict if it had considered the newly discovered evidence." Dayton v. Martin (1987), 43 Ohio App.3d 87,90. "The task of the reviewing court is then to determine whether the trial judge abused its discretion in making this determination." Id. The deference shown to a trial court on a Crim.R. 33(A)(6) motion for a new trial is premised in large part upon the familiarity of the trial court with the details of the case as a result of having presided over the actual trial. State v. Larkin (1996), 111 Ohio App.3d 516, 523.
 {¶ 13} In his first assignment of error, appellant argues[1]
that Wierzgac's deposition and testimony are newly-discovered evidence which warrant a new trial pursuant to Crim.R. 33(A)(6). Specifically, appellant asserts that Wierzgac's deposition and testimony clearly establish that appellant was innocent of aggravated murder (that is, of murder with prior calculation and design), that threats made by Watkins and the assault on Haggerty provoked appellant, and that the attack on Watkins was motivated by self-preservation and self-protection and not by race. Appellant bases his assertions upon Wierzgac's statements that (1) Wierzgac was told by Vandersommen to pack his belongings as they were going to the hole for a fight, (2) Wierzgac and the other five inmates entered Adams A for a fight, (3) the purpose of the shanks was to keep correction officers and other inmates away from the fight, and (4) the only inmate Wierzgac saw stab Watkins was Bishop.
 {¶ 14} Upon thoroughly reviewing appellant's jury trial and Wierzgac's deposition and testimony, we find that the trial court did not abuse its discretion by overruling appellant's motion for a new trial for the following reasons. The purpose of Wierzgac's deposition and testimony at Bowling's trial was to elicit responses as to Bowling's involvement in Watkins' murder. In his deposition, Wierzgac stated that on the day of the attack, he was told by Vandersommen that they were going to Adams A to "rumble" (that is, fight) and to get ready to go to the hole. Once in Adams A, he observed appellant, who had the largest shank, hold correction officer Browning against the wall demanding the keys to the cells. Wierzgac and Lovejoy were then told to stand guard at the control desk. While standing guard, Wierzgac did not see his fellow inmates go to Watkins' cell, Watkins run out of his cell, or Bowling stab Watkins. He did see, however, appellant getting ready to confront Watkins, and Bishop stabbing Watkins a couple of times in the head. Wierzgac also stated that following their surrender, he heard Bowling talk about a list of people he and the other five inmates were supposed to get while in Adams A. It was also then that Wierzgac found out about Watkins' alleged attack on Haggerty the day before. Wierzgac denied being a member of the Aryan Brotherhood.
 {¶ 15} During Bowling's trial, Wierzgac similarly testified. He also testified that while standing guard, he heard yelling and screaming. Immediately after, he witnessed Watkins run by him and up to the second floor where appellant and Bowling were waiting for him. Wierzgac then saw Bishop stab Watkins. Appellant and Bowling were telling Bishop to stab Watkins. Wierzgac's testimony at Bowling's trial revealed that he was not watching the attack the whole time as he was busy standing guard and dealing with correction officers trying to enter Adams A.
 {¶ 16} Wierzgac also testified that following their surrender, appellant and his accomplices were taken to "receiving." While there, Wierzgac overheard a conversation between his accomplices. The conversation revealed that (1) Bowling and appellant were both in Watkins' cell until Watkins escaped, (2) appellant spared Watkins' cellmate from harm by telling his accomplices that he was not the one who did it, (3) appellant, Bowling, Bishop, and Vandersommen all stated they had stabbed Watkins, and (4) appellant, Bowling, and Vandersommen had a list of juvenile inmates they wanted to get for "jumping" Haggerty. Again, it was while in receiving that Wierzgac found out about the attack on Haggerty the previous day and the "hit" list. Again, Wierzgac denied being an Aryan but admitted associating with his Aryan accomplices, including appellant. Wierzgac also testified that unlike him, all of the other five inmates wanted to be transferred from MCI.
 {¶ 17} In denying appellant's motion, the trial court concluded that "Wierzgac's testimony would not have rebutted [appellant's] prior calculation and design, would not have supported actual innocence, [and] would have been cumulative to [appellant's] trial evidence that Watkins provoked the fight[.]" We agree. Watkins was stabbed 40 times. Wierzgac did not testify that the only inmate who stabbed Watkins was Bishop. Rather, he testified that the only inmate he saw stab Watkins was Bishop. Two of the lethal wounds were attributed to appellant's shank. By his own admission, Wierzgac did not witness much of the attack as he was standing guard. The alleged attack on Haggerty by Watkins was already in evidence at appellant's trial and was simply cumulative.
 {¶ 18} Appellant makes much ado about the fact that Wierzgac was told they were going to Adams A to fight as proof that he was innocent of aggravated murder. However, Wierzgac was recruited at the last moment and had no knowledge about the attack on Haggerty. In addition, he was told by Vandersommen, not by appellant. The evidence submitted at trial established that appellant took over Adams A and went after Watkins, shank in hand, with prior calculation and design, motivated in part by the previous attack on Haggerty and with the hope of being transferred from MCI. Appellant's conduct before, during, and after Watkins' murder is inconsistent with an "instantaneous eruption of events." State v.Taylor, 78 Ohio St.3d 15, 22, 1997-Ohio-243. Rather, his conduct clearly indicated his determination to follow through on a specific course of conduct. Wierzgac's statements certainly do not disclose a strong probability that the outcome of a new trial would be different. Rather, we find that his statements, particularly with regard to the existence of a "hit" list, would instead boost the state's theory that appellant intended to kill Watkins.
 {¶ 19} We note that the trial judge in this case was the same judge who presided over appellant's trial. As a result, he is not only familiar with the various theories presented on both sides at the trial regarding appellant's intent in taking over Adams A and going after Watkins, he also has intimate knowledge of the case. See State v. Wayt
(Aug. 24, 1998), Butler App. No. CA98-03-063.
 {¶ 20} We therefore find that the trial court's denial of appellant's motion for a new trial pursuant to Crim.R. 33(A)(6) was not an abuse of discretion. Appellant's first assignment of error is overruled.
Assignment of Error No. 2
 "THE TRIAL COURT ERRED IN FAILING TO FIND COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 21} To support a claim of ineffective assistance of counsel, the defendant must first show that counsel's actions were outside the wide range of professionally competent assistance. Strickland v.Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052. Second, the defendant must demonstrate that he was prejudiced by counsel's actions. Id. Trial counsel's performance will not be deemed ineffective unless the defendant shows that "counsel's representation fell below an objective standard of reasonableness," id. at 688, 104 S.Ct. 2052, and that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley
(1989), 42 Ohio St.3d 136, 143, certiorari denied (1990), 497 U.S. 1011,110 S.Ct. 3258. The defendant bears the burden of establishing both prongs before a reviewing court will deem trial counsel's performance ineffective. Strickland at 687, 104 S.Ct. 2052.
 {¶ 22} A properly-licensed attorney is presumed competent. Vaughnv. Maxwell (1965), 2 Ohio St.2d 299, 301. Any questions regarding the ineffectiveness of counsel must be viewed in light of the evidence against the defendant, Bradley at 142-143, with a "strong presumption that counsel's conduct falls within the wide range of professional assistance." Strickland at 689, 104 S.Ct. 2052. A presumption exists that "under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. It is not the role of the appellate court to second-guess the strategic decisions of trial counsel. State v. Carter,72 Ohio St.3d 545, 558, 1995-Ohio-104, certiorari denied (1995),516 U.S. 1014, 116 S.Ct. 575. Hindsight may not be used to distort the assessment of what was reasonable in light of trial counsel's perspective at the time. State v. Cook (1992), 65 Ohio St.3d 516, 524-525, certiorari denied (1994), 510 U.S. 1040, 114 S.Ct. 681. A defendant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic. State v. Brown
(1988), 38 Ohio St.3d 305, 319.
 {¶ 23} Appellant argues that his trial attorneys were ineffective because they failed to investigate the facts of the case, interview witnesses such as Wierzgac, and present their testimony at trial. Specifically, appellant first asserts that had his trial attorneys interviewed witnesses, testimony could have been presented that appellant was not the principal person stabbing Watkins.
 {¶ 24} We note that apart from appellant's unsubstantiated assertion, the record before us (which, again, does not include the evidence appellant submitted with his PCR petition) does not show that his trial attorneys failed to investigate the facts of this case. It may be that his trial attorneys conducted a diligent investigation but were simply unable to find substantial mitigating evidence. See State v.Hutton (1990), 53 Ohio St.3d 36. Appellant fails to overcome the strong presumption that his trial attorneys' conduct falls within the wide range of professional assistance. In addition, we fail to see how the outcome of the trial would have been different had his trial attorneys presented testimony that other inmates had also stabbed Watkins. As the supreme court found, "the evidence was substantial that appellant was a principal offender. There was substantial testimony that the shank in appellant's possession caused two of Watkins's six fatal wounds. * * * `[P]rincipal offender' means the `actual' killer and not the `sole' offender. As there can be more than one actual killer, there can thus be more than one principal offender." Stojetz, 84 Ohio St.3d at 458-459. We therefore find no ineffective assistance of counsel.
 {¶ 25} Appellant also asserts that had his trial attorneys interviewed witnesses, testimony could have been presented that appellant was innocent of aggravated murder, that threats made by Watkins and the assault on Haggerty provoked appellant, and that the attack on Watkins was motivated by self-preservation and self-protection and not by race. It is well-established that decisions regarding the calling of witnesses are within the purview of defense counsel's trial tactics. State v.Coulter (1992), 75 Ohio App.3d 219, 230. In addition, appellant's contentions have already been considered under appellant's first assignment of error. We therefore incorporate our treatment of those arguments under this assignment of error. In light of the foregoing, we find no ineffective assistance of counsel. Appellant's second assignment of error is overruled.
Judgment affirmed.
POWELL, P.J., and YOUNG, J., concur.
[1] Appellant also challenges two findings made by the trial court. First, appellant takes issue with the trial court's finding that Wierzgac saw Bishop stab Watkins twice when in fact Wierzgac testified he saw Bishop stab Watkins a couple of times. Appellant also takes issue with the trial court's finding that it was "clear that [appellant] had admitted to his counsel that he had committed every act that the discovery and trial evidence established that he committed." Appellant contends that such finding is unsupported by any evidence and is mere speculation. We note that this finding was not actually made by the trial court in the analysis of its decision denying appellant's new trial motion, but rather, was originally made in the trial court's decision overruling appellant's petition for postconviction relief ("PCR") which is not before us on appeal. Inexplicably, the trial court put excerpts of its decision denying appellant's PCR petition in its decision denying appellant's new trial motion. The excerpts precede the trial court's analysis on appellant's new trial motion. While we agree that both findings are not supported by the record before us (which does not include the evidence submitted by appellant for his PCR petition), we find that they do not meet the Petro criteria, and therefore do not warrant a new trial.