The STATE of Ohio, Appellee,

v.

BROWN, Appellant.

[Cite as *State v. Brown* (1992), 84 Ohio App.3d 414.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 61478.

Decided Dec. 21, 1992.

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *Leo Gorie,* Assistant Prosecuting Attorney, for appellee.

*Greene & Hennenberg* and *Larry W. Zukerman,* for appellant.

JAMES D. SWEENEY, Judge.

Defendant-appellant James J. Brown was tried to the bench and convicted on six counts, each with specifications. Appellant was convicted of aggravated burglary in violation of R.C. 2911.11; grand theft in violation of R.C. 2913.02; two

counts of felonious assault in violation of R.C. 2903.11; failure to comply with order or signal of police officer in violation of R.C. 2921.331; and possession of criminal tools in violation of R.C. 2923.24. The appellant was sentenced to a term of incarceration of ten to twenty-five years, with ten years of actual incarceration on counts one, three, four and five; one and one-half to five years on count two; two to ten years on count six; all to run concurrently. Execution was suspended only on count five.

The state presented the testimony of Ms. Kim Wharton, who resided at the Village–in–the–Park Apartments in Westlake, Ohio. Wharton testified that on January 31, 1990, she was in her bedroom when she heard noises on her patio. By peeking around a doorway, she observed a man breaking into her apartment. Wharton exited through the front door and called the police.

Patrolman Patrick E. Kelly testified that he responded to the police broadcast. Upon arrival at the apartment complex he saw appellant walking quickly toward a white car. Although the officer requested the appellant to stop, the appellant entered the car and drove away. The court also heard the testimony of two other police officers, Richard Papes and Charles Bronston, that appellant led a high speed chase through Westlake, Bay Village, Rocky River, Lakewood, and Cleveland. These officers testified that while they were in pursuit, appellant swerved his vehicle in an effort to force each of them off the road. Appellant eventually was apprehended near West 103rd Street in Cleveland. Appellant was transported back to the apartment complex, where Wharton identified him by his clothing as the intruder.

The trial of this matter did not occur until a year after the appellant's arrest. The victim's jewelry was found in the appellant's jacket, which had been held in the Westlake Police Department's property room for the one-year period.

The appellant testified on his own behalf. Appellant testified that he has a long history of arrests, mostly burglaries, but that he also had a history of cooperating with police, admitting when he committed a crime, returning stolen articles, and helping the police "clear up" other burglaries.

In mid-January 1990, appellant was released from prison on prior charges. Upon release, appellant testified that he decided to "talk to his mother," and took a cab to Lakewood. He went to a gas station, near the police station, and sat in the back corner lot for some time. He then went back downtown and took a bus to Mansfield. The next week he returned to Cleveland with his cousins, where they engaged in drug abuse.

When questioned more closely about January 31, 1990, the appellant testified that he spent the previous evening in Mt. Vernon, Ohio, with his wife. After an argument, he took her car and drove to Cleveland to visit his cousin. After more

drug abuse, he drove to Lakewood, and dropped his cousin off at a "dope" house. He discovered that he was near the gas station and pulled in. He sat on the corner and "talked to his mother." Appellant testified:

"Q. You feel your mother is buried on that property?

"A. I talked to you about it. I tried to get somebody—the people here to get the Lakewood police to dig up the files to let me take her. I know she's been there a long, long time. For some reason it doesn't bother me. Now she is not buried. It is not proper. She don't want to be there. I have to put her someplace. I don't want to put her in—I want to put her in North Royalton. There is a good cemetery there.

"Q. What happened with you at the gas station?

"A. Me and mom talked quite a while. It was a chilly day. It was sunny out, and I just sat there and talked. I don't remember what all we talked about, but I got mad. I was getting mad at my mom said, I need to get a shovel, either find a shovel or buy a shovel. I didn't have a shovel in the car. The best thing I had was screwdrivers, tools. I didn't have a crowbar. In that type of car you have to crank it, so I got in the car. I started driving out on Detroit. I drove way out.

"Q. Do you remember driving way out on Detroit?

"A. I remember going past the Lakewood Police Department.

"Q. Do you remember anything after that?

"A. Not much.

"Q. Do you remember getting into Westlake?

"A. I remember going all the way out towards—passed around Avon, somewhere. I have cousins that live out there, too, and they live in a place called Sheffield Lake. I remember going that direction. I never made it to their house.

"Q. What is the next thing you remember?

"A. Seeing a doctor here.

"Q. When was that?

"A. I don't know. Sometime around February. I am not good on dates. I am very bad.

"Q. Would it have been February 1st?

"A. No. Just a few days before the feds came and got me. They put me on the sixth floor. When everybody comes in here you go through a special interview. I guess I was wired up pretty good. I heard sounds. These people

realized something was wrong. He evaluated me. A couple of days later a doctor saw me, and I don't know what all he prescribed.

"Q. That's at the medical and psychiatric floor, correct?

"A. Yes, the psychiatric floor.

"Q. You were there for 10 to 14 days, would that be fair?

"A. To be honest, I don't know.

"Q. It could have been a few days, maybe?

"A. Yes.

"Q. That's the next thing you remember, talking to a doctor?

"A. Yes.

"Q. Do you remember going to an apartment building on Detroit, the apartment that's been testified to by Kim Wharton and the police officers here?

"A. No."

As his testimony continued, it was evident that appellant had no recollection of the events at Wharton's apartment, nor of the high speed chase afterwards. Appellant testified that he is a nonviolent person and that he is a burglar because he cannot face people.

Appellant was apparently an abused child, and believes his father murdered his mother and buried her at a gas station in Lakewood. Appellant testified that his father is currently incarcerated on child molestation charges.

Appellant sets forth four assignments of error, the first three of which will be considered together.

## I

"The trial court improperly 'accepted' the pychiatric [sic] report finding the appellant sane and thus denied the appellant due process of law and the the [sic] effective assistance of counsel under the U.S. Constitution and O.R.C. 2945.37, et seq."

## II

"The trial court denied the appellant effective assistance of counsel under the Sixth and Fourteenth Amendments of the U.S. Constitution and the Ohio Constitution and violated his right to due process as applied to the state by and through the Fourteenth Amendment of the U.S. Constitution when it denied him an independent psychiatric evaluation and accepted the sanity report without counsel's stipulation."

## III

"Failure of defense counsel to refer the appellant for a psychiatric evaluation for competency and failure to enter a written not guilty by reason of insanity plea constituted ineffective assistance of counsel."

Throughout all three of these assignments of error, appellant is essentially arguing that he was rendered ineffective assistance of counsel during the pendency of the charges against him. Trial counsel for the appellant was assigned on December 12, 1990, and trial commenced February 11, 1991. No request for a competency hearing was made on the record prior to trial. Neither was a plea of not guilty by reason of insanity entered.

The test for ineffective assistance of counsel was reiterated by this court in *State v. Eberling* (Apr. 9, 1992), Cuyahoga App.Nos. 58559 and 58560, unreported, 1992 WL 74227. The court held:

"The Sixth Amendment to the United States Constitution provides that the accused shall enjoy the right to 'have the Assistance of Counsel' in all criminal prosecutions. See, also, Section 10, Article I, Ohio Constitution. The Supreme Court of the United States has recognized that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial in that it assures the fairness, and thus, the legitimacy of our adversary process. *Powell v. Alabama* (1932), 287 U.S. 45 [66, 53 S.Ct. 55, 63, 77 L.Ed. 158, 169]; *Johnson v. Zerbst* (1938), 304 U.S. 458 [462–463, 58 S.Ct. 1019, 1022–1023, 82 L.Ed. 1461, 1465-1466]; *Gideon v. Wainwright* (1963), 372 U.S. 335 [342–443, 83 S.Ct. 792, 794–796, 9 L.Ed.2d 799, 804-805]; *Kimmelman v. Morrison* (1986), 477 U.S. [365, 377–378, 106 S.Ct. 2574, 2584–2585, 91 L.Ed.2d 305, 320-321]. The constitutional right to counsel is the right to effective assistance of counsel. *McMann v. Richardson* (1970), 397 U.S. 759, 771 [90 S.Ct. 1441, 1449, 25 L.Ed.2d 763, 773–774].

"In *Strickland v. Washington* (1984), 466 U.S. 668, 687 [104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693], the Supreme Court of the United States set forth the following two-pronged analysis for determining whether counsel's assistance was so defective as to require reversal[:]

" [']First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction * * *

resulted from a breakdown in the adversary process that renders the result unreliable.[']

"In other words, counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. *State v. Bradley* (1989), 42 Ohio St.3d 136 [538 N.E.2d 373], at paragraph two of the syllabus. * * * *"

The morning of trial in the case *sub judice,* the following colloquy occurred:

"THE COURT: Okay. We are here on the matter of the State of Ohio, Case No. 249310, versus James Joseph Brown.

"We have received just this morning a sanity report which states that the defendant did not, at the time of the offense, suffer from a mental disease or defect.

"It says he was—did have a long history of substance abuse and was a product of an abusive environment, but they said he did not suffer from a mental disease or defect at the time of the offenses.

"You have anything with regard to that, Mr. Gaunter?

"MR. GAUNTER: Your Honor, we would request, and we thank the court for the referral to the psychiatric clinic, but we requested that because my client has no recollection of the events surrounding the date of the incident as set forth in the indictment and because of his long history of abuse suffered at the hands of his father, various psychiatric experiences that are detailed by Ms. Haines in the report as set forth by Dr. King; however, your Honor, we would respectfully request of the Court that the Court grant an order for an independent psychiatric evaluation of Mr. Brown.

"THE COURT: Mr. Gorie.

"MR. GORIE: Your Honor. I object to the referral. I think it would be frivolous. I have no reason to believe the conclusion will be different.

"THE COURT: All right. I will overrule the motion."

R.C. 2945.37 mandates a hearing on the issue of defendant's competency to stand trial where the issue is raised before trial, and for good cause shown where raised after trial has begun. The issue of appellant's competency was never raised, and the discourse above does not constitute a hearing on that issue. From the statements read by the judge, it is evident that the psychiatric evaluation was performed to evaluate the appellant's sanity at the time the crimes were committed, and not his competency to stand trial.

Under the facts and circumstances of this case, it was incumbent upon appellant's counsel to, at the very least, raise the issue of appellant's competency to stand trial.

The ultimate irony of this case is that the views of this court are supported by the brief of the prosecution. The state concedes that no plea of not guilty by reason of insanity was entered, nor was a request for a competency hearing made. The appellee's brief states:

"Trial procedures concerning the insanity issues are governed by R.C. 2945.37 through R.C. 2945.40. It should first be noted that, in the instant case, Appellant was not referred for an evaluation for competency to stand trial nor was a written plea of not guilty by reason of insanity entered on his behalf.

"When a defendant is referred for an evaluation of sanity at the time of the act, there is no statutory requirement that a hearing be held on the issue in the absence of a formal plea of not guilty by reason on sanity. Indeed, if the issue of competency (as distinguished from sanity at the time of the act) is raised, R.C. 2945.37 mandates that 'the Court shall hold a hearing on the issue as provided in this section.' "

The prosecution also points out that appellant's trial counsel made no effort to challenge the psychiatric report that was submitted to the court:

"The trial court also gave Appellant's trial counsel an opportunity to be heard concerning the contents of the report. Appellant's counsel presumably could have challenged the finding of the report by whatever means he chose, but elected not to do so, instead requesting an independent evaluation.

"In sum, the trial court although not required to do so, held a hearing on the psychiatric report and gave Appellant's trial counsel every opportunity to be heard.

" * * *

"Appellant's counsel made no request to have the examining psychiatrist testify."

We do find it troublesome that the appellant's counsel did not seek to question the examining psychiatrist as a witness when given an opportunity by the judge to challenge the report. Since the report itself has not been included as part of the record on appeal, we are unable to hold that this particular failure rose to the level of ineffective assistance of counsel.

However, trial counsel was assigned to represent a man who had no recollection of life for a period of several days, and no recollection of the crimes of which he was accused. His last memory is of speaking to his mother whom he believes is buried at a service station in Lakewood. He recalls the need to find a

shovel so he can properly bury her at a cemetery in North Royalton. Appellant then "woke up" in the psychiatric unit of the Cuyahoga County Jail. There is no trial tactic or strategy which would reasonably have led trial counsel under such circumstances to fail to enter a plea of not guilty by reason of insanity on behalf of his client. Until such a plea was entered, the trial judge had no obligation to even consider ordering the requested independent evaluation pursuant to R.C. 2945.39(A).

This failure to enter a plea of not guilty by reason of insanity pursuant to Crim.R. 11 falls below an objective standard of reasonable representation. Appellant was prejudiced by the failure of counsel to bring before the court the only possible theory of defense to the charges against him.

Appellant's first, second and third assignments of error are well taken, and this case is remanded for a new trial.

Appellant's fourth assignment of error provides:

## IV

"The trial court denied the appellant his right to a speedy trial pursuant to O.R.C. 2941.401 and O.R.C. 2963.30."

R.C. 2941.401 allows a person serving a term of incarceration to request adjudication on pending charges. The statute, in pertinent part, states:

"When a person has entered upon a term of imprisonment in a penal or correctional institution of this state, and when during the continuance of the term of imprisonment there is pending in this state any untried indictment, information, or complaint against the prisoner, he shall be brought to trial within one hundred eighty days *after he causes to be delivered to the prosecuting attorney and the appropriate court* in which the matter is pending, written notice of the place of his imprisonment and a request for a final disposition to be made of the matter, except that for good cause shown in open court, with the prisoner or his counsel present, the court may grant any necessary or reasonable continuance. The *request of the prisoner shall be accompanied by a certificate of the warden or superintendent having custody of the prisoner,* stating the term of commitment under which the prisoner is being held, the time served and remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the adult parole authority relating to the prisoner.

"The written notice and request for final disposition *shall be given or sent by the prisoner to the warden or superintendent having custody of him, who shall promptly forward it with the certificate to the appropriate prosecuting attorney and court by registered or certified mail, return receipt requested."* (Emphasis added.)

■ Although the record reflects a photocopy of a letter sent on April 6, 1990, by the appellant to Prosecutor John T. Corrigan, the prosecutor at trial avowed no knowledge of the letter. The letter states that appellant was in the Franklin County Jail. The docket and court file reflect no receipt of the letter. Assuming the letter was mailed to the prosecutor's office, the appellant still failed to comply with the other requirements of R.C. 2941.401. The letter was not filed with the court, nor was there a certificate by the warden or superintendent. Both the letter and the accompanying certificate should have been mailed by the warden or superintendent to the prosecutor and to the court by certified mail, return receipt requested. Absent compliance with R.C. 2941.401, the court was not obligated to bring appellant to trial within one hundred eighty days.

■ The record does reflect a letter requesting disposition of pending charges received by the trial court on October 25, 1990, from the United States Penitentiary in Terra Haute, Indiana. This letter comports with the requirements of R.C. 2963.30, which essentially mirrors R.C. 2941.401, but applies to prisoners held out of state. Appellant properly invoked his rights, and was brought to trial within the one hundred eighty days set forth in R.C. 2963.30.

Appellant's forth assignment of error is overruled. The judgment is reversed and the cause is remanded.

*Judgment reversed*
*and cause remanded.*

BLACKMON and KRUPANSKY, JJ., concur.