OPINION.
{¶ 1} The state of Ohio brings this appeal, pursuant to leave granted by this court, from the judgment of the trial court granting the motion of the defendant-appellee, Michael Hedgecoth, for a new trial following his convictions on eleven counts of felonious assault, one count of inducing panic, and one count of improperly discharging a firearm. In its sole assignment of error, the state argues that the trial court erred by granting a new trial on the basis that Hedgecoth had been denied the effective assistance of trial counsel. For the reasons that follow, we agree with the state and thus reverse.
 {¶ 2} Hedgecoth was found guilty after a jury trial on April 22, 2002. The evidence at trial established that, at the time of the offenses, Hedgecoth had been depressed over a prolonged period of unemployment and a job search hampered by his inability to drive as a result of extremely poor vision. Hedgecoth was also suffering from an anxiety disorder that caused him physical symptoms such as a feeling of tightness in his chest. As if that were not enough, Hedgecoth experienced occasional cluster headaches. His general practitioner had prescribed the antidepressant Zoloft, which he was taking ultimately at a dosage of 150 milligrams a day, in addition to Clonopan, a drug to ward off anxiety or panic attacks. Unfortunately, when Hedgecoth's wife, Lora, lost her job at Sears, the couple lost their medical insurance, and the medication became simply too expensive for their limited budget. Consequently, Hedgecoth's doctor put him on a more affordable alternative, Xanax, which he was allowed to take three times a day.
 {¶ 3} To compound the Hedgecoths' concerns, Lora had a history of intermittent health problems. On February 4, 2002, while at work at Lazarus (where she had yet to put in sufficient time to receive health-insurance benefits), Lora called home to tell Hedgecoth that she had set up an appointment with their doctor to investigate a lump that she had discovered in one of her breasts. Lora testified that her husband became immediately upset. Part of the couple's concern was that Lora's mother had died in what she described as a "horrible death" from breast cancer. She stated that she felt like she had to return home due to Hedgecoth's emotional reaction to the news, and that when she did, she found her husband "sitting in the bathroom on the floor, absolutely crying his eyes out, sobbing." She stated that throughout the day he continued to express his fears for her health and the couple's ability to pay for her treatment.
 {¶ 4} The next morning, on February 5, 2002, Hedgecoth uncharacteristically did not accompany his wife to the doctor's office, but, rather, stayed in bed. When she returned home, she described him as "absolutely unresponsive" when she told him that the doctor had diagnosed a massive infection throughout her lymph nodes, which would have to be treated before any determination could be made whether she had cancer. Despite the infection, Lora told her husband that the news was relatively good and that their doctor was optimistic. She stated that the couple then took separate naps due to the lack of sleep they had both experienced the night before.
 {¶ 5} When Lora awoke, she described her husband as walking around the apartment crying and holding his head. She stated that he was experiencing a severe cluster headache. She placed a call to their doctor. As they waited for a return call, Hedgecoth told his wife that he had taken an unusually large dose of Xanax while she slept because he felt that he could no longer deal with their problems. After Lora and Hedgecoth both finished talking on the telephone with the doctor's nurse to discuss possible medication, Hedgecoth revealed to his wife that he had just taken an additional 15 Xanax pills. (Lora testified that she later discovered a Xanax prescription bottle that had been refilled with 90 pills on February 1, just four days before. The bottle was empty.)
 {¶ 6} Based on what Hedgecoth had told her on the telephone about a possible overdose, the nurse called an ambulance to the residence. The nurse had told Lora of this, and when Lora told her husband, he responded by taking a pill container out of his pocket and ingesting more pills. He then retrieved a gun that the couple kept under the couch for protection, told his wife that he needed to sleep and wanted to be left alone, and then went into the bathroom, shutting and locking the door behind him.
 {¶ 7} The paramedics arrived almost immediately, accompanied by a police officer. When Lora answered the door, she explained the situation to the officer, who, concerned for her safety, directed her to come outside. The officer would not allow her to go back inside although she continued to express her desire to go back and talk to her husband. The officer radioed for assistance, and soon other police officers arrived, the entire street was cordoned off, and eventually police negotiators and the Cincinnati Special Weapons and Tactics (SWAT) team were called to the scene.
 {¶ 8} Things progressed from bad to worse. When Hedgecoth refused a call to come out of the apartment, the police entered and determined his location in the bathroom. A dialogue was begun with the police negotiators. Hedgecoth threatened to shoot anyone coming into the bathroom. After a period of conversation in which Hedgecoth asked one of the negotiators if he was wearing Kevlar and standing clear of the door, Hedgecoth fired a gunshot through the bathroom door. He did this five or six times, each time warning the negotiator that he should stand clear of the door.
 {¶ 9} Negotiations continued for the next four hours. At some point, Hedgecoth began randomly firing shots through the walls, without warning. The officers in the apartment used ballistics blankets and ballistic shields ("body bunkers") to protect themselves. There was testimony that the officers felt that Hedgecoth was trying to "bait" the officers by directing them to a particular location — the refrigerator, for example (telling them to go look at the scarcity of food) — and then firing in that direction. One of the SWAT team members described Hedgecoth as playing "a game of cat and mouse." Another described his actions as "very systematic." Ironically, Hedgecoth had once trained police officers in crisis and negotiation situations, and several of the officers in the apartment testified that he used that experience to his advantage, telling the officers what their tactics allowed at any given point and actually trying to coach them in their efforts to subdue him. For example, one of the officers testified that Hedgecoth told him, "I have got a headache, I know you're not allowed to give me any medicine, and when you tell me no, that I can't have anything for my headache, it's going to piss me off, and I'm going to fire another shot." At that point, the officer testified, Hedgecoth asked for some medicine, and when the request was denied, he fired another shot.
 {¶ 10} The standoff continued for another four hours. The police eventually switched off the electricity in the apartment, extinguishing the lights in the bathroom. Hedgecoth responded by firing several rounds in random directions, one of which struck the building next door and entered the bedroom of one of the neighbors who, unbeknownst to the police, had sneaked back into the building. At one point, Hedgecoth shouted out that there had better not be anyone climbing up a ladder into the window and then shot out the window. One of the officers testified that he believed that Hedgecoth shot at the window in the belief that an officer would be appearing outside it.
 {¶ 11} Because of the random gunfire, the head of the SWAT team concluded that it was time to take more decisive action. Canisters of irritant gas were set off in the apartment. Hedgecoth reacted initially by firing off two more rounds, but then when more gas canisters were released, overwhelming him, he decided to surrender. Although he was told by negotiators to open the bathroom window and to throw his gun out onto the lawn, he broke the window and set the gun between the glass and the screen, still within his possible reach. Officers approached the bathroom door warily in case he made a sudden move for the gun. Hedgecoth eventually walked out of the bathroom, and he was immediately taken into custody.
 {¶ 12} All told, Hedgecoth had fired seventeen rounds.
 {¶ 13} A jury trial was held beginning April 14, 2002. Hedgecoth testified in his own defense. He described his emotional turmoil. He stated that the first rounds he fired through the door were merely to demonstrate to the officers that he had a weapon. He then testified, "What happened next was I think the Xanax started to kick in, because I have very little recollection of anything. As I was kind of preparing myself before the jury, I thought, well, what did we do for eight hours? And I don't recall any of that, of anything. I don't recall that they were attempting to end it any time soon. I don't know." He denied, however, that he had ever tried to bait the police officers toward the refrigerator, or that he had shot rounds in their direction. He testified that he remembered shooting at the light bulb in the bathroom after the police had turned off the power. "I said, okay, now I'm in the dark, I don't need a light bulb, and I tried to shoot out one of the light bulbs in the bathroom, and it ended up that is the bullet that everyone is talking about that they all ran, running, fearing for their lives." The same gunfire, he testified, accidentally ended up near the refrigerator after it passed through the bathroom wall. He also testified that when he shot out the window, it was because the negotiator had been directing him to throw the gun out the window, and he could not open it without smashing it. He denied knowing that anyone other than the lead negotiator, whom he believed to be an ambulance driver, was in his apartment. He further denied being able to hear the voices of any other officers and maintained that throughout the ordeal he was only aware of the presence of the lead negotiator. He disclaimed all intention of trying to shoot anyone. "There is no way," he testified, "that I would ever[,] ever point a gun hoping to, or thinking, that I could actually hit a police officer, or a civilian, for that matter. That's just not me." Hedgecoth admitted, though, that he could not account for ten of the seventeen rounds that he had fired.
 MOTION FOR NEW TRIAL {¶ 14} Following trial, the trial court dismissed one of the felonious-assault counts under Crim.R. 29. The jury found Hedgecoth guilty on all the remaining counts, obviously choosing not to believe his testimony that he was unaware of the officers in his apartment and that he was not trying to shoot at them. It should be pointed out that the testimony of several officers regarding Hedgecoth's comments during the ordeal contradicted his testimony that he did not know that there were any other officers in the apartment besides the lead negotiator. The officers' testimony also established that Hedgecoth remained responsive and alert to what was being said to him throughout the ordeal, giving no evidence of being groggy or sedated.
 {¶ 15} Prior to sentencing, the trial court, sua sponte, ordered that Hedgecoth be examined by the Court Clinic Forensic Services. The report, written by psychologist Sherry Baker, was delivered to the court on May 28, 2002, prior to sentencing. One day later, the trial court imposed a total sentence of six years. On the sentencing worksheet, the trial court checked off four of the five factors indicating a lack of recidivism and also noted that Hedgecoth "ha[d] very serious mental health issues."
 {¶ 16} The very next day, May 30, 2002, the trial court appointed appellate counsel. On June 5, 2002, appellate counsel filed a motion for a new trial. The grounds for the motion were that newly discovered evidence, i.e., Baker's report, demonstrated that Hedgecoth's trial attorney had rendered ineffective assistance of counsel by failing "to investigate and pursue possible defenses, including not guilty by reason of insanity." The motion also cited the decision of the Cuyahoga County Court of Appeals in State v. Brown (1992), 84 Ohio App.3d 414,616 N.E.2d 1179, and the similarly captioned decision of this court,State v. Brown (Feb. 19, 1993), 1st Dist. No. C-920300, for the proposition that a trial attorney is ineffective for not raising competency or sanity issues whenever the defendant cannot recall the "event at issue" and presents "mental health issues."
 {¶ 17} After a hearing conducted the day before, the trial court, on June 26, 2002, granted the motion, finding that "the conduct of the previous trial counsel in his representation of [Hedgecoth] f[ell] below an objective standard of reasonable representation." Responding to a "Suggestion of Incompetency" filed the same day by Hedgecoth's new counsel, the trial court ordered that Hedgecoth undergo a psychiatric examination by the Court Clinic Forensic Services in order to determine his mental competence and to make a recommendation of his legal competency to stand trial.
 {¶ 18} On July 24, 2002, the state moved for leave to file this appeal.
 THE BAKER REPORT {¶ 19} In the report of her examination, Dr. Baker described Hedgecoth as being, on the date of the interview, "alert, responsive, and cooperative," as well as "fully oriented." She described his attention and concentration as good, except when he was discussing his wife's medical condition, at which point, she stated, his mood would become depressed and he would lose his composure until the subject was changed. She stated, "No symptoms of mental illness (e.g., hallucinations or delusions) were reported and no signs of such were observed in his behavior." She characterized his intellectual ability as "functioning in the average to high average range." According to the report, Hedgecoth denied any substance or alcohol abuse, or any emotional difficulties in his upbringing. He presented a medical history of depression, anxiety attacks, and cluster headaches. Baker also indicated that Hedgecoth felt sad and overwhelmed by stress. He told her that some of the details of the police standoff were "fuzzy" because of the effects of Xanax. Similar to his testimony at trial, he claimed that he could remember only "bits and pieces until the end of the confrontation." He characterized his emotional state during the standoff as "overloaded" and expressed resentment toward the ambulance driver and police for not heeding his cries to be left alone. He told Baker that after a while "it became a matter of principle" that they should leave him alone, and that he just wanted to have some solitude to concentrate on the problems confronting him. He described himself as "mentally numb" due to the Xanax.
 {¶ 20} Baker further stated that the results of the Minnesota Multiphasic Personality Inventory administered to Hedgecoth showed "[n]o significant problems or pathology." She stated that people with similar scores tended to report problems stemming from the home or their marital situation, and that they also were likely to be "overly conventional and have a high need to be liked and accepted." She noted that people with such scores "have great difficulty with, and are very uncomfortable in handling, confrontative situations involving anger or self-assertiveness." She concluded, "Mr. Hedgecoth has had a productive history in terms of employment and managing a twenty-two-year marriage, as well as caring for his ailing wife. Mr. Hedgecoth stated he was under a great deal of stress at the time of the offense[s] and became overloaded when it was suggested that his wife may have breast cancer. Mr. Hedgecoth stated he coped as well as he could with the immediate situation. After taking the Xanax, he was emotionally agitated but mentally numb. His judgment was impaired and he responded to what was said to him without comprehending the larger picture."
 STANDARD OF REVIEW {¶ 21} As the state acknowledges, this court has previously held that a defendant may validly assert the denial of the effective assistance of counsel as grounds for a new trial under Crim.R. 33(A)(1) or 33(E)(5). See State v. Judy (July 23, 1986), 1st Dist. No. C-850796, and State v. Norton (July 24, 1985), 1st Dist. No. 840415. However, as we observed in Judy, a petition for postconviction relief may provide a more appropriate and effective vehicle for such a claim since it is usually dependent upon facts dehors the record.
 {¶ 22} As we noted in Judy, the decision to grant or deny a motion for a new trial based upon a claim of ineffective assistance of counsel generally lies within the sound discretion of the trial court. Such being the case, that discretion cannot be disturbed on appeal absent a showing that the trial court acted unreasonably, arbitrarily, or unconscionably. See Pembaur v. Leis (191), 1 Ohio St.3d 89, 91, 437 N.E.2d 1199, 1201.
 {¶ 23} The trial court's discretion, however, is not absolute. As in the case of a motion for a new trial premised solely upon newly discovered evidence, see State v. Petro (1947), 148 Ohio St. 505,76 N.E.2d 370, there are certain legal criteria that must be met in order to set aside a conviction based upon a claim of ineffective assistance of counsel. The convicted defendant must make a twofold demonstration. First, the defendant must demonstrate that his trial attorney substantially violated an essential duty owed him. Second, the defendant must demonstrate that his defense was prejudiced by his counsel's ineffectiveness. State v. Lytle (1976), 48 Ohio St.2d 391, 358 N.E.2d 823;State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus; Strickland v. Washington (1984), 466 U.S. 668,693, 104 S.Ct. 2052. The prejudice, moreover, must be fixed and ascertainable; specifically, the defendant must demonstrate that there exists a reasonable probability that the trial would have resulted differently were it not for his attorney's ineffectiveness. Id.; see, also, Hill v. Lockhart (1985), 474 U.S. 52, 59, 106 S.Ct. 366.
 {¶ 24} As this court has held before, while the final decision whether to grant or deny a new trial may rest within the sound discretion of the trial court, a state's challenge to whether the legal criteria for a new trial have been met, in order to provide a basis for the exercise of the court's discretion, is reviewable as a question of law. See Statev. Larkin (1996), 111 Ohio App.3d 516, 523, 676 N.E.2d 906.
 {¶ 25} Here, the motion for a new trial was based upon Hedgecoth's trial attorney's failure to "investigate and pursue possible defenses, including not guilty by reason of insanity." As we read the motion, it provided two grounds: (1) that because Hedgecoth had stated that he could not recall the entire standoff, the holdings of the Cuyahoga County Court of Appeals in State v. Brown, supra, and this court in an unreported decision, State v. Brown, supra, required his attorney to raise the issue of not only his competency to stand trial, but also his sanity at the time of the offenses; and (2) that the report of the psychologist, Baker, demonstrated reason to believe that Hedgecoth had had available to him certain defenses based upon his mental condition that his trial attorney had not adequately investigated.
 {¶ 26} With respect to the first ground, we perceive absolutely no evidence in the record that even remotely supports the proposition that Hedgecoth was incompetent to stand trial. A person is incompetent to stand trial only when, because of his mental condition, he is incapable of understanding the nature and objective of the proceedings against him or of assisting in his defense. R.C. 2945.37(G). A person is presumed to be competent and is not rendered incompetent merely by being mentally ill or mentally retarded, or because he is receiving psychotropic drugs or medication. R.C. 2945.37(F).
 {¶ 27} We do not, moreover, interpret either the Cuyahoga County Court of Appeals' decision in State v. Brown, supra, or our own unreported decision in State v. Brown, supra, as standing for the extreme proposition for which Hedgecoth cited it to the trial court: that every time a defendant claims some inability to recollect all or part of the offense for which he is charged, his attorney must request a competency evaluation or be deemed ineffective. In the decision from the Cuyahoga County Court of Appeals, the defendant had a history of mental illness and "psychiatric experiences," a problem with drug abuse, absolutely no recollection of the crimes of which he was accused, no memory of his life for several days, and a false belief that he was speaking to his dead mother, whom he felt was improperly buried and whose body he felt obligated to disinter and give a proper burial. Under those circumstances, the Cuyahoga Court of Appeals held that there was no trial tactic or strategy that would have justified trial counsel failing to enter a plea of not guilty by reason of insanity. Id. at 422,616 N.E.2d 1179. In our own unreported decision in State v. Brown, there was a court-ordered report that had found that the defendant suffered from "severe mental illness" in the form of schizophrenia, probably of the paranoid type.
 {¶ 28} In contrast to the defendants in both Brown decisions,
there is absolutely no evidence that Hedgecoth suffers, or suffered, from any mental illness or has had any history of substantial alcohol or substance abuse, or that he suffers, or suffered, from delusions. Although he was perhaps clinically depressed and subject to periodic anxiety attacks and cluster headaches, these are psychological disorders that would not have precluded his understanding of the charges against him or the nature and object of the proceedings. At trial, he testified that the Xanax he voluntarily ingested made it difficult to recall entirely the details of his standoff with the police, but this fact alone, even if true (the prosecutor pointed out during cross-examination that Hedgecoth could only remember things helpful to his defense and professed not to recall things to his detriment), would not have rendered him incompetent to aid in his own defense. Hedgecoth, in fact, testified quite competently and nimbly in his defense, and it is impossible to read his testimony and come to the conclusion that he was in any way even the slightest bit impaired from knowing exactly what was going on throughout the proceedings.
 {¶ 29} With respect to Baker's report and a possible insanity defense, we are compelled to agree with the state that there is nothing contained in the report that would demonstrate a "reasonable probability" that Hedgecoth could have succeeded on an insanity defense. Baker stated that she found no mental illness. To the contrary, she described Hedgecoth as "alert," "cooperative," "fully responsive," and anywhere from average to above average in intelligence. She found no history of delusions, no childhood problems, and no alcohol or substance abuse. The most that can be said from the report is that Baker validated Hedgecoth's description of himself as being "emotionally overloaded" at the time of the incident and depressed over his wife's medical condition. Neither of these states of mind, however, equated to a defense of insanity.
 {¶ 30} The only conceivable basis for any type of defense based upon Hedgecoth's mental state would have been the effect of the overdose of Xanax he allegedly ingested on his capacity to form the necessary criminal intent. In order to use this as a basis for a claim of ineffective counsel, however, Hedgecoth would have needed to produce some evidence dehors the record to demonstrate what an expert on the effects of the drug would have testified to concerning his mental state during the standoff. Furthermore, such opinion evidence would have had to be particularly compelling given the testimony of several officers at trial that Hedgecoth's almost mocking dialogue with the negotiator demonstrated that he was fully alert and neither groggy nor sedated. Without such additional evidence, any prejudice resulting from his trial counsel's failure to pursue this line of defense would be entirely speculative. As we noted earlier, certain claims of ineffective assistance of counsel are more suitable to postconviction relief, where additional probative evidence can be properly presented.
 {¶ 31} In sum, we cannot, on this record, find any of the legal criteria necessary for the trial court to have exercised its discretion to grant a new trial. Although we do not minimize the trial court's superior position in gauging the performance of trial counsel, there still must be some indicia of a substantial breach of a professional duty owed to the defendant and resulting prejudice. On this record, we can discern neither.
 {¶ 32} Accordingly, the state's assignment of error is well taken. The trial court's order granting Hedgecoth a new trial is reversed, and his conviction and sentence are reinstated.
Judgment reversed and conviction and sentence reinstated.
Sundermann, P.J., and WINKLER, J., concur.