DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Danny L. Anaya, appeals the judgment of the Lucas County Court of Common Pleas. He was indicted for the aggravated murder of Rhonda Anaya, his wife, and was convicted, after a jury trial, of the lesser included offense of murder, R.C. 2903.02, an unclassified felony. The trial court imposed an indefinite term of 15 years to life incarceration. For the following reasons, the judgment is affirmed.
 {¶ 2} After his indictment and arrest, appellant remained in custody. His attorney, Thomas Szyperski, requested that appellant be referred to the Court Diagnostic *Page 2 
and Treatment Center for a psychiatric competency evaluation. On January 10, 2006, a competency hearing was held, but the trial court granted appellant's counsel's request for a second psychiatric examination and evaluation and continued the matter. Appellant was transferred to the forensic unit of the Twin Valley Behavioral Healthcare Columbus campus.
 {¶ 3} Another competency hearing was held April 13, 2006, pursuant to R.C. 2945.371, and the reports of three psychiatric evaluating experts were admitted into evidence. Each of the three expert witnesses testified at the hearing: Dr. Thomas G. Sherman, Dr. Charlene A. Cassel, and Dr. Mark Fettman. Each expert had conducted "hundreds" of competency evaluations. Each concluded that appellant was "malingering," i.e., feigning mental illness, and was not mentally ill. For example, appellant reported that he had nightly conversations with Rhonda and did not believe she was dead. He also reported that his internal organs had exploded and a metal device had been implanted that Rhonda used to communicate with him. Each expert wrote that these were not genuine hallucinations but were rather consistent with feigning mental illness. Cassel and Fettman concluded that appellant was competent to stand trial, while Sherman refrained from giving a solid opinion as to appellant's competency. Sherman and Cassel noted that appellant's behavior at the hearing was markedly different from his behavior during their evaluations. Fettman, the psychiatrist with Twin Valley, noted that appellant had been in residence and under constant observation and that no staff had reported appellant exhibiting any symptoms of mental illness. Each expert reviewed substantial amounts of material concerning appellant's prior history in addition to conducting *Page 3 
interviews and testing. They each found appellant's lack of mental illness history, his graduate-level education, and his long professional employment noteworthy.
 {¶ 4} Based on the three submitted reports and testimony, the trial court determined appellant was competent to stand trial. The proceedings moved directly to arraignment, and Szyperski orally entered pleas for appellant of not guilty and not guilty by reason of insanity. The trial court accepted the not guilty plea, but told counsel to file a written NGRI plea within seven days.
 {¶ 5} On May 4, Szyperski was granted leave to withdraw as appellant had requested and, on May 9, Peter G. Rost and Jane Roman were appointed to represent appellant. No written NGRI plea was filed by Szyperski, Rost, or Roman.
 {¶ 6} Trial proceeded without an NGRI plea and the following evidence relevant to this appeal was adduced. Three of appellant's children testified, each of whom were in the home when their mother was killed. Rhonda and appellant had been married for 19 years before Rhonda filed for divorce in July 2005. Rhonda had been sleeping on the family room sofa since that time. The three children, a 15 year-old girl, a 16 year-old girl, and a 14 year-old boy, each had upstairs bedrooms of their own.
 {¶ 7} The youngest daughter related that on October 24, 2005, a Monday, she had gone to school, came home afterwards, and took a nap in her bedroom until 10:00 p.m. Then she woke, made herself a sandwich, and ate it in her upstairs bedroom and went to sleep around 11:00 p.m. Around 3:00 a.m., on October 25, 2005, sounds of scratching and the front door opening and closing woke her. Then she heard a muffled scream from downstairs and she went to the family room, where the lights were on. In the family *Page 4 
room, she saw Rhonda slouched half on and half off the couch, and appellant was standing over her. She asked appellant, who she saw had blood "spattered" on his face, what was going on and he told her that Rhonda had a nightmare and had punched him. As appellant was telling her that nothing was wrong and to go back upstairs to bed, she saw him put a knife in the back waistband of his jeans. She also saw that appellant had a pair of rubber gloves in the back pocket of his jeans and had work gloves on his hands. She heard Rhonda asking appellant what he was doing and why he was wearing gloves. The daughter recognized the long, wooden-handled knife from the kitchen, saying, "It almost looked like a machete * * * we always used it to cut watermelon."
 {¶ 8} She returned to her bedroom and tried to call police but could not get a signal on her cell phone. She then heard Rhonda screaming, and she went to the stairway landing, leaned over, looked into the kitchen, and saw appellant stab Rhonda with the same knife three times and saw Rhonda with her hands up, trying to fend off the attack. She then ran back into her bedroom and was able to call 911 from her cell phone. A tape of the 911 call was submitted as evidence and played to the jury.
 {¶ 9} Appellant's older daughter came home from school that day, ate a pizza with Rhonda, and went to her room between 9:30 and 10:00 p.m. She did not go to sleep and went downstairs to the kitchen around 2:25 a.m. for a drink. She saw Rhonda sleeping on the family room couch and did not turn on any lights. She went back to her room, went to sleep, and was woken by the sound of screaming at 3:06 a.m., according to her bedroom clock. She heard appellant say, "Get back to bed" and thought appellant must have been speaking to her brother, who, she assumed, must have been making the *Page 5 
noise. Then she heard both Rhonda and appellant fighting, heard more screaming, and heard her younger sister go halfway down the stairs, scream, and run back into her bedroom. Soon after, the noises stopped and she heard her brother ask appellant if everything was alright and heard appellant tell him to go back to bed. She then got dressed and went to her younger sister's room, who told her quickly what she had seen, and then returned to speaking to the 911 dispatcher.
 {¶ 10} Appellant's son testified that when he went to his upstairs bedroom around 11:00 p.m., his mother was in the family room and appellant was in his upstairs bedroom. He was woken by sounds of scratching and "people running around." Thinking it was the family dog, he stayed in bed; a few minutes later, he heard screaming, so he went downstairs. He stopped on the stairway landing as appellant was exiting the kitchen. He asked appellant what happened and appellant told him to go back to bed. He went back to his bedroom, but thinking that something was wrong, he went to his younger sister's bedroom. There, his younger sister told him that she saw appellant stabbing Rhonda and had called police. The older sister was already in the room with his younger sister. At about the same time, he heard knocking on the front door; the police had just arrived in response to the 911 call.
 {¶ 11} Sylvania Police Officers Crowell and Haase, the initial responders, testified to the condition of the scene as they found it. When appellant opened the door after they knocked, he was sweating heavily, had small cuts on his cheek, and had blood on his face. One officer told appellant they needed to talk, and appellant immediately responded, "She attacked me." The officers entered the front room, and Haase walked *Page 6 
approximately ten feet straight back into the kitchen looking for appellant's wife while Crowell stood with appellant. When Haase saw Rhonda lying on the floor, he immediately told Crowell to handcuff appellant. When Crowell did so, he noticed blood on appellant's hands. He led appellant outside the home and placed him in a patrol vehicle.
 {¶ 12} Haase, meanwhile, called emergency medical services and checked Rhonda for life signs without touching her, but she, in his opinion, was already dead. Rhonda had a large kitchen knife in her left hand; the youngest daughter had testified that Rhonda was right-handed. Other officers were arriving at that point, and after securing the scene, Crowell and Haase went upstairs to sit with the three children.
 {¶ 13} Officer Froelich, the EMS respondent, testified that he found no vital signs when he first arrived and checked Rhonda. He and his partner attempted to resuscitate, but their efforts were unsuccessful. The coroner testified that among the multiple stab wounds that Rhonda suffered, at least two knife wounds were definitely fatal. Many of the knife wounds were "defensive" wounds, "inflicted on the person who attempts to defend him or herself." An analyst with the Bureau of Criminal Identification and Investigation laboratory testified to the DNA testing of the physical evidence. Where blood was found on an item, testing indicated it belonged to either appellant or Rhonda, the children having been excluded as contributors.
 {¶ 14} During his testimony, when directly questioned, appellant admitted that he killed Rhonda, stating, "I didn't plan to or mean to, but yes." He denied any plan or intention to kill Rhonda. Explaining, he related that he was woken by voices outside the *Page 7 
house around 3:00 a.m. Tuesday morning. He had fallen asleep in multiple layers of clothing because he had bad knees and had intended to use carpet cleaner he had just purchased to clean his bedroom floor. He put on work gloves to deal with some garbage cans outside before he left for work, and went outside to investigate the voices. He found no one, and when he came inside, Rhonda was sitting up on the sofa. The two began a conversation about holiday vacation time with the children. They began to argue, and Rhonda struck him in the face. They began to struggle, but stopped when their youngest daughter came down and turned on the lights.
 {¶ 15} According to appellant, he walked into the kitchen to check his face for injuries, and Rhonda followed him, continuing to argue. Rhonda grabbed a knife, and a struggle began, with both fighting over the knife. Appellant admitted that he stabbed Rhonda multiple times, and admitted, in graphic detail, that he caused each of her wounds. He acknowledged hearing his youngest daughter say something and his son coming downstairs at one point. He also remembered putting the knife into Rhonda's hand afterwards, but claimed not to know whether she was dead at that point. Dazed, he then went upstairs and had begun to change out of his clothes when the police arrived. He explained that he intended to call 911 but did not have time.
 {¶ 16} The state argued that ample evidence supported a finding that appellant had a prior purpose and a plan to kill Rhonda. First, the state pointed to the unusual fact that appellant was wearing multiple layers of clothing and heavy work gloves at 3:00 a.m. and had two pairs of rubber gloves in his back pocket. Second, the youngest daughter testified that appellant had a knife in the family room when she saw him standing over *Page 8 
Rhonda. Third, three days prior, appellant purchased plastic gloves and carpet cleaner; the state argued that appellant purchased these intending to clean the scene after he killed her. Fourth, appellant's company car, which he drove home that day, had plastic sheeting covering the trunk's interior weighed down with a pair of shoes appellant used for yard work; appellant claimed not to know how or why the plastic sheeting was there. Fifth, a quilt had been placed on the kitchen table at some point that evening; the state argued that appellant placed the quilt there intending to carry Rhonda's body to the car.
 {¶ 17} Appellant's attorney argued in closing that the physical evidence showed that the way appellant killed Rhonda demonstrated his lack of a plan or prior purpose to kill; that the killing occurred in a fit of sudden rage during a domestic violence fight; and that, in sum, the evidence fit the definition of voluntary manslaughter.
 {¶ 18} The trial court instructed the jury regarding aggravated murder, and the lesser-included offenses of murder and voluntary manslaughter. The jury found appellant guilty of murder. From that judgment, appellant appealed as of right and now asserts one assignment of error for review:
 {¶ 19} "I. Danny was denied effective assistance of counsel in violation of his rights guarantees under Article I, Section 10 of the Ohio Constitution and the Sixth Amendment to the United States Constitution."
 {¶ 20} Concomitantly with the error, appellant has identified three areas in which, he alleges, his counsel was ineffective:
 {¶ 21} "A. Counsel failed to adequately delineate the case for voluntary manslaughter. *Page 9 
 {¶ 22} "B. Counsel failed to find an independent forensic psychiatric expert to determine Danny's competency or sanity at the time of the offense.
 {¶ 23} "C. Counsel was ineffective for failing to plead not guilty by reason of insanity."
 {¶ 24} In order to establish ineffective assistance of counsel, an accused must show: (1) that his trial counsel's performance was so deficient that the attorney was not functioning as the counsel guaranteed by the Sixth Amendment of the United States Constitution; and (2) that counsel's deficient performance prejudiced the defense.Strickland v. Washington (1984), 466 U.S. 668, 687. In order to demonstrate ineffective assistance of counsel, an accused must satisfy both prongs. Id. With respect to the first prong, courts indulge a strong presumption that counsel was competent. Vaughn v. Maxwell (1965),2 Ohio St.2d 299, 301. An appellant must show that his counsel's performance fell below an "objective standard of reasonableness."State v. Bradley (1989), 42 Ohio St.3d 136, 142, quotingStrickland, 466 U.S. at 687-688. Claimed errors must be more than disagreements over trial strategy. State v. Brown, 115 Ohio St.3d 55,2007-Ohio-4837, ¶ 53.
 {¶ 25} With respect to the second prong, prejudice is shown where there is a reasonable probability that a different result would have occurred in the case if the attorney had not erred. State v.Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. A reviewing court "must consider the totality of the evidence before the judge or jury." Id. at 142, quoting Strickland, 466 U.S. at 695-696. Considering the totality of the evidence, and accounting for any errors which counsel may have made, the appellant *Page 10 
must carry "the burden of showing that the decision reached would reasonably likely have been different absent the errors." Id.
 {¶ 26} Appellant first argues that his trial counsel did not advocate strenuously enough for a verdict of voluntary manslaughter. We disagree. Appellant primarily argues that his counsel should have submitted more evidence or elicited more testimony regarding his mental health issues and medical issues in order to demonstrate provocation. Having carefully reviewed the evidence and the arguments, we find that even if appellant's counsel had done what he suggests, the decision would not likely have been different. Counsel pointed to DNA evidence, the chronology, appellant's testimony, the patterns of knife wounds, and the circumstances of the divorce to buttress the theory that Rhonda instigated a physical struggle and provoked appellant to use deadly force. Even if counsel had elicited further testimony from appellant regarding the mental states which he had revealed to the three evaluating experts, it would likely have had no impact on the jury's decision. Appellant also argues that his counsel spent most of closing arguments rebutting the state's case for aggravated murder and should have, instead, argued more vehemently for voluntary manslaughter. After carefully reviewing both the record and closing arguments, counsel pursued a reasonable trial strategy given the evidence against appellant.
 {¶ 27} Next, appellant argues that his trial counsel should have secured an independent forensic psychiatric expert to determine his sanity at the time of the offense. This assertion resembles the argument found not well-taken in State v. Johnson, 1st Dist. No. C-030643,2004-Ohio-3624. The Johnson court held that in order for the defendant *Page 11 
to prevail on a claim of ineffective assistance, he had to show a reasonable probability that he would have been found not guilty by reason of insanity if another psychiatric evaluation had been performed. Id. at ¶ 12. Johnson's counsel raised the issue of his competency and entered a plea of not guilty by reason of insanity. The court ordered a psychiatric evaluation, which concluded that Johnson was malingering, was feigning a mental disorder, was competent to stand trial, and did not meet the criteria for an NGRI defense. Johnson's counsel then waived the opportunity for the second, independent evaluation allowed by R.C.2945.371(B). Considering the expert evaluation and the totality of the evidence at trial, the court held that the argument was "too speculative" because Johnson did not show a "reasonable probability that an additional expert evaluation would have changed the result of his case." Johnson, 2004-Ohio-3624, ¶ 21.
 {¶ 28} The same analysis applies here. Three separate experts conducted examinations and rendered evaluations to the court. Each expert independently concluded that appellant did not suffer from a mental illness and showed signs of malingering. Considering the concurrence of three separate expert evaluations, there is no reasonable probability that yet another expert evaluation would have changed the result of this case.
 {¶ 29} Last, appellant asserts that he was denied ineffective assistance of counsel because none of his lawyers filed a written plea of not guilty by reason of insanity after his first counsel orally entered the plea at the end of the competency hearing. Where facts and circumstances indicate that a plea of not guilty by reason on insanity would have had a reasonable probability of success, it is ineffective assistance of counsel to fail *Page 12 
to enter the plea. State v. Brown (1992), 84 Ohio App.3d 414. Where, however, facts indicate that counsel was pursuing a reasonable strategy in not so pleading, or where the likelihood of success for the plea is low, the decision is not unreasonable. State v. Twyman, 2d Dist. No. 19086, 2002-Ohio-3558 (defendant had mental health disorder but no reasonable probability he would have been acquitted by reason of insanity); State v. Martin, 12th Dist. Nos. CA2003-06-065, CA2003-06-066, 2004-Ohio-702 (same); State v. Robinson, 6th Dist. No. L-03-1307, 2005-Ohio-5266, ¶ 33 (psychological evaluations and defendant's testimony showed counsel's decision not to seek insanity defendant was reasonable); State v. Johnson, 2004-Ohio-3624.
 {¶ 30} Given the evidence submitted during the competency hearings, counsel was not unreasonable for not entering an insanity plea. Moreover, the record demonstrates that appellant testified against the advice of his counsel, and admitted during his testimony to killing his wife. Counsel's strategy of ameliorating appellant's admissions by making the case for voluntary manslaughter instead of pursuing an acquittal by reason of insanity falls within the range of competent professional assistance.
 {¶ 31} For the foregoing reasons, appellant was afforded effective assistance of counsel and his assignment of error is therefore not well-taken. The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense in preparation of the record, fees allowed by law and the fee for filing the appeal is awarded to Lucas County.
 JUDGMENT AFFIRMED. *Page 13 
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
 Peter M. Handwork, J., Arlene Singer, J., William J. Skow, J., CONCUR. *Page 1